UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

E.D., a minor, b/n/f MICHAEL DUELL as
parent and next friend of E.D., LISA
DUELL as parent and next friend of E.D.,
and NOBLESVILLE STUDENTS FOR LIFE,

                              Case No: 1:21-cv-03075-SEB-TAB

        Plaintiffs,

    v.

NOBLESVILLE SCHOOL DISTRICT,
NOBLESVILLE HIGH SCHOOL,
SUPERINTENDENT BETH NIEDERMEYER,
CRAIG MCCAFFREY, JANAE MOBLEY,
JEREMY LUNA, ALEXANDRA SNIDER
PASKO, ALISON ROOTES, ALLISON
SCHWINGENDORF-HALEY, ELIZABETH
KIZER, EMILY PATTERSON-JACKSON,
GRACE TUESCA, and STEPHANIE EADS,

        Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Liberty L. Roberts, Atty. No. 23107-49
LRoberts@cchalaw.com
Cassie N. Heeke, Atty. No. 36497-49
cheeke@cchalaw.com
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060

# Table of Contents

*Defendants' Brief in Support of Cross- Motion for*
*Summary Judgment and Response in Opposition to*
*Plaintiffs' Motion for Summary Judgment*

TABLE OF AUTHORITIES ................................................................................5

ISSUE STATEMENT ......................................................................................8

INTRODUCTION ..........................................................................................9

I.    Statement of Material Facts Not in Dispute ......................................11

    A.  Defendants ..............................................................................11

    B.  Noblesville Schools Policies .......................................................12

    C.  Noblesville High School Student Groups.......................................14

    D.  2019 CRU Issue with adult involvement........................................14

    E.  Noblesville Students for Life Formation ........................................15

    F.  Noblesville Students for Life Flyers..............................................16

    G.  Noblesville Students for Life Temporary Suspension........................19

    H.  Social Media discussion .............................................................21

II.    Summary Judgment Legal Standard....................................................22

III.    Argument .....................................................................................23

    A.  The revocation of NSFL was not the result of any policy or practice of Noblesville Schools or by a person with final policymaking authority, as required for Plaintiffs to succeed on Counts I-V under VII under Monell ...................................................................................23

        1.  NSFL was not temporarily revoked as the result of any express policy of Noblesville Schools..........................................................24

        2.  NSFL was not temporarily revoked as the result of any widespread practice of Noblesville Schools .......................................................25

        3.  NSFL's club status was not revoked by a person with final policymaking authority.........................................................................26

4. Lack of *Monell* liability defeats Plaintiffs' claims against the School under the First Amendment, Fourteenth Amendment, and Equal Access Claims.......................................................................................27

B. Noblesville Schools' practice related to club flyers did not violate Plaintiff's First Amendment right to freedom of speech..........................28

1. NHS hallway walls were not a public forum........................................29

2. Noblesville Schools' practice of restricting political content on flyers was reasonable.......................................................................................31

3. Noblesville Schools did not violate the First Amendment when it refused to let E.D. hang flyers that said "Defund Planned Parenthood." ...................................................................................................32

C. Plaintiffs cannot make *primia facie* case of First Amendment retaliation.. ...................................................................................................34

1. Individual-capacity Defendants Niedermeyer, Mobley, and Luna did not revoke of the club's status .............................................................34

2. Dr. McCaffrey did not revoke the club's status because of the club's political views on abortion .................................................................35

3. Individual-capacity Defendants Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads did not take any adverse action against Plaintiffs under color of law ........................................36

4. Even if Plaintiffs' First Amendment retaliation claims against the individual-capacity Defendants survived, the Defendants are entitled to qualified immunity ...........................................................................38

D. The Individual Defendants did not violate the Equal Access Act, because the temporary revocation of NSFL was not the basis of speech at NSFL meetings.......................................................................................39

E. Plaintiffs are not entitled to relief under Article I, Section 9 of the Indiana Constitution ...............................................................................41

IV.    CONCLUSION ...................................................................................43

**Table of Contents**

*Defendants' Response in Opposition to Plaintiffs'*
*Motion for Summary Judgment*

I.  STATEMENT OF MATERIAL FACTS IN DISPUTE .........................................44

II.  ARGUMENT ...........................................................................................47

    A.  Plaintiffs fail to recognize that their constitutional and EAA claims brought under § 1983 must be analyzed under *Monell* .............................47

    B.  Noblesville Schools' practices related to student clubs do not violate the First Amendment for granting unbridled discretion to administrators ......48

    C.  Plaintiffs have produced no evidence of a casual connection between NSFL's pro-life viewpoint and Dr. McCaffrey's decision to temporarily revoke NSFL's approval ..........................................................................50

    D.  Noblesville Schools' policies and procedures were not "void for vagueness" in violation of the Fourteenth Amendment's due process clause ............................................................................................................51

    E.  NSFL was permitted to form and there was no violation of Plaintiffs' Fourteenth Amendment Equal Protection rights .......................................52

    F.  Plaintiffs present no evidence of content-based discrimination to support their Equal Access claim ..........................................................................53

    G.  Even if Plaintiffs were entitled to summary judgment to liability, the issue of damages should not be determined on Summary Judgment ................54

III.  CONCLUSION .....................................................................................55

CERTIFICATE OF SERVICE.........................................................................58

**Table of Authorities**

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................22

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ..........................................................51

*Black v. Clarke*, 285 F. Supp. 3d 1070 (E.D. Wis. 2018)............................................................37

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005).....................................................................25

*Carver Middle School Gay-Straight Alliance v. Sch. Bd. of Lake Cnty., Fla.*, 249 F. Supp. 3d 1286 (M.D. Fla. 2017)...............................................................................................24, 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................................22, 23

*Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools,* 457 F.3d 376 (4th Cir.2006))............................................................................................................49

*Chortek v. City of Milwaukee*, 356 F.3d 740 (7th Cir. 2004) .......................................................24

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .................................................................32

*Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788 (1985)................30

*Darst v. Interstate Brands Corp.*, 512 F.3d 903 (7th Cir. 2008) ..................................................22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .........................................55

*Dhillon v. Crown Controls Corp.,* 269 F.3d 865 (7th Cir. 2001) ..................................................55

*Frederickson v. Landeros*, 943 F.3d 1054 (7th Cir. 2019)...........................................................38

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .............................................50

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464 (7th Cir. 2001).....26, 32, 39, 40, 41

*Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309 (Fed. Cir. 2002) ...........................................49

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)..................................................................................38

*Hazelwood School Dist. V. Kuhlmeier* 484 U.S. 260 (1988)......................................29, 30, 31, 32

*Hill v. Colorado*, 530 U.S. 703 (2000)........................................................................................51

*Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001) ........................................................36

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986)...............................32, 33, 48

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011) .............51

*Kennedy v. Kennedy*, 616 N.E.2d 39 (Ind. Ct. App. 1993) ..........................................42

*Messerschmidt v. Millender*, 565 U.S. 535 (2012)........................................................38

*Minnesota Voters All. v. Mansky*, 201 L. Ed. 2d 201, 138 S. Ct. 1876 (2018) ............29

*Monell v. Dept. of Soc. Serv.*, 436 U.S. 658 (1978)......................................................24

*Novoselsky v. Brown*, 822 F.3d 342 (7th Cir. 2016).....................................................37

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ....................................................26

*Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) ..............29, 30

*P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770 (7th Cir.1986) ..................................50

*Plaats v. Barthelemy*, 641 F. App'x 624 (7th Cir. 2016) .............................................37

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021).........9

*Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004))....................49

*R.Z. ex rel. Zimmer v. Carmel Clay Sch.*, 868 F. Supp. 2d 785 (S.D. Ind. 2012) ........34

*Shoultz v. State*, 735 N.E.2d 818 (Ind. Ct. App. 2000)................................................42

*Siddique v. Laliberte*, 972 F.3d 898 (7th Cir. 2020).....................................................38

*Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008) ..................................................34

*Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115 (1974)..............................................43

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ..............................................................37

*Vergara*, v. City of Waukegan, 590 F. Supp. 2d 1024 (N.D. Ill. 2008) ........................26

*Walker v. Sheahan*, 526 F.3d 973 (7th Cir. 2008) ........................................................24

*Watson v. Indiana Dep't of Correction*, No.18-02791, 2020 WL 5815051 ........................... 24, 25

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 716 F. Supp. 2d 773 (W.D. Wis. 2010), *aff'd on other grounds*, 658 F.3d 614 (7th Cir. 2011) ................................................................ 49

*Wilson v. Price*, 624 F.3d 389 (7th Cir. 2010) ............................................................................ 36

STATUTES / RULES

20 U.S.C. §4071 ............................................................................................................... 23, 39, 53

42 U.S.C. § 1983 ........................................................................................................................... 24

Fed. R. Civ. P. 56 ..................................................................................................................... 22, 54

S.D. Ind. L.R. 56-1(e) ................................................................................................................... 55

**Issue Statement**

This case is before the Court on cross motions for summary judgment. Plaintiffs filed a Motion for Summary Judgment which is purported to be filed on all issues, including damages. But Plaintiffs' Brief makes no argument to address the six *Monell* claims asserted against Noblesville Schools, nor does it address the First Amendment retaliation claims asserted against the individual defendants.

Defendants, in this brief, move for summary judgment on all claims that remain pending in Plaintiff's Amended Complaint. Defendants are entitled to summary judgment on the six *Monell* claims in Counts I, II, III, IV, V, and VI. There is no written policy, widespread practice, or act of a final policymaker that caused the harm alleged by the Plaintiffs – the temporary revocation of the club status for Noblesville Students for Life. As for the claims against the individual defendants, the evidence shows that the conduct at issue was either not taken by the individuals, was not taken under color of law, or was not a violation of the First Amendment. On the state law constitutional claim there is no evidence of an abuse of the right to speak, and there is no basis to award the injunctive or declaratory relief requested.

# I.    INTRODUCTION

Plaintiffs' lawsuit is not based on evidence or law, but on E.D.'s presupposition that Noblesville Schools would reject NSFL because of its pro-life stance. The overarching theory of Plaintiffs' case is that Noblesville Schools either promotes or restricts political speech based upon whether it agrees with the viewpoint expressed. [Doc. 43 at 28, ¶¶281-83] More specifically, Plaintiffs contend Noblesville Schools does not agree with Noblesville Students for Life's ("NSFL") stance on abortion and favors liberal viewpoints, and thus, denied E.D. [1] permission to hang certain flyers and suspended NSFL's status on September 3, 2021. [Doc. 43 at 25-28] The undisputed evidence shows no animus towards the club's pro-life stance. Rather, E.D. began this process looking for a fight and jumped at the chance to file a lawsuit even when the facts did not support it.

In summer 2021, prior to her freshman year at Noblesville High School ("NHS"), E.D., started planning for NSFL. Before speaking with anyone at Noblesville Schools, E.D. started imagining herself in "incredible and brave scenarios of potentially suing [her] school, hosting fiery debates, delivering impassioned speeches, somehow winding up on the Ben Shapiro show, testifying before the Supreme Court, etc." [Ex. 564 - E.D.'s journal; Ex. 568 - E.D. Dep. II, p. 57:3-10; 67:25-69:15] Anticipating conflict, E.D. asked her mother to record her first conversation with NHS principal, Dr. Craig McCaffrey, in case Dr. McCaffrey gave "discriminatory or other

---

[1] For purposes of Defendants' Motion, E.D. and NSFL are referred to somewhat interchangeably, and collectively as "Plaintiffs." As an association, NSFL's standing "is derivative of—and not independent from" the individual standing of its member(s). *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021). E.D.'s standing to pursue the claims in the Amended Complaint is the entire basis for NSFL's ability to pursue the same claims. *Id*. By necessity, E.D. and NSFL's interests and the factual basis for Plaintiffs' claims are identical. As such, NSFL's claims cannot proceed if summary judgment is entered against E.D., and vice versa. Any entry of summary judgment in the Defendants' favor should be entered against all Plaintiffs.

false reason" not to permit NSFL. [Ex. 567 - E.D. Dep. I, 13:21-14:3] And later, after NSFL's status was suspended, E.D., before knowing why it was suspended, began actively looking to sue the school before Dr. McCaffrey could "smell what's going on." [Ex. 568 - E.D. Dep. II, 84:15-88:5; Ex. 565 – Email between E.D. and Mary Carmen, 9/4/21] The evidence shows E.D. has no legal claims against any of the Defendants, and this lawsuit is E.D.'s effort to live out her dream of suing her school.

Dr. McCaffrey approved NSFL with full knowledge of its pro-life stance, and E.D. participated in the school's club fair promoting NSFL with pro-life materials. A month later, NSFL's status was suspended, not because of the club's stance on abortion, but because after a club call-out poster was denied, E.D. and her mother engaged in a classic game of "if mom says no, ask dad." [Ex. 569 - McCaffrey Dep. I, 91:5-95:4] When Dr. McCaffrey learned of E.D.'s attempt to defy Assistant Principal Mrs. Mobley's instructions and learned that Mrs. Duell had participated in a second school meeting about NSFL and assisted E.D.'s attempt to defy Ms. Mobley's directions, he decided to suspend NSFL's ability to meet on campus through the remainder of the semester. [Ex. 5 – McCaffrey Email suspending club status, 9/3/21; Ex. 569 - McCaffrey Dep. I, 102:13-103:14; 105:4-109:29]

None of E.D.'s claims are supported by the evidence or the law and the Defendants are entitled to summary judgment on all claims. For ease of reference, the remaining claims are as follows:

| Count I: | Violations of the Right of Association by Defendants NHS, Noblesville Schools (for revocation of club status); |
|---|---|
| Count II: | Violations of the Right to Freedom of Speech by Defendants NHS, Noblesville Schools (for revocation of club status); |

**Count III:** Violation of Plaintiffs' Fourteenth Amendment Right to Due Process against NHS, Noblesville Schools (for revocation of club status);

**Count IV:** Violation of Plaintiffs' Fourteenth Amendment Right to Equal Protection of the Law against NHS, Noblesville Schools (for revocation of club status);

**Count V:** Violations of Right to be Free from Retaliation against NHS, Noblesville Schools (for revocation of club status);

**Count VI:** Violations of Right to be Free from Retaliation against Niedermeyer, McCaffrey, Mobley, Luna, Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads (individual capacity claims) (for comments and likes on social media);

**Count VII:** Violations of the Equal Access Act against NHS, Noblesville Schools, and McCaffrey, Mobley, and Luna (in their individual capacities) (for revocation of club status);

**Count XIX:** Indiana Constitutional Violations against NHS, Noblesville Schools, Niedermeyer (official and individual capacities), McCaffrey (official and individual capacities), Mobley (official and individual capacities), Swafford (official and individual capacities), and Luna (official and individual capacities) (for revocation of club status).

[Doc. 98 at 39-41; Doc. 102; Doc. 43]

## I. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A. Defendants

1. NHS is a building that is part of the public school system known as Noblesville Schools. [Ex. 576 – McCaffrey Affidavit ¶6]

2. In fall 2021, the individually named Defendants had the following roles/jobs: Dr. Craig McCaffrey was the NHS Principal; Janae Mobley was Assistant Principal at NHS; Jeremy Luna was Dean of Students at NHS; Beth Niedermeyer was Noblesville Schools Superintendent; Alison Rootes was a technical assistant who primarily worked at North Elementary and Stony Creek Elementary; Elizabeth Kizer was a special education teacher and transition coordinator at NHS; Emily Patterson-Jackson was an instructional assistant in

special education classes at Noblesville West Middle School; Grace Tuesca was a Miller Explorers after-school and before-school teacher for grades two through five; Allison Haley was an English teacher at NHS; and Stephanie Eads was a second-grade teacher at Stony Creek Elementary. Alexandra Snider-Pasko was an attendance and in-school suspension assistant at Noblesville East Middle School at the beginning of the fall 2021 semester, but she resigned prior to the date Plaintiffs allege she "liked" a Facebook comment—the only conduct alleged against Snider-Pasko.[2] [Ex. 576 - McCaffrey Affidavit ¶8; Ex. 577 - Pasko Dep., 22:14; Ex. 26 - Facebook comment "liked" by Alexandra Snider Pasko; Ex. 511- First Thread of Comments on Mahoney's Facebook Post]

**B. Noblesville Schools Policies**

3.　　During the 2021-2022 school year, Noblesville Schools did not have written rules or policies on the process for starting a new student interest club. [Ex. 570 - McCaffrey Dep. II, 24:15-25:8] Rather, a student with a club proposal would be instructed to find a faculty sponsor and fill out a brief questionnaire. [Ex. 569 - McCaffrey Dep. I, 21:10 23:23] Students would bring questions to their sponsor, who would help with supervision and logistics. [Ex. 569 - McCaffrey Dep. I, 37:20-38:8]

4.　　At the time of the events alleged in the Amended Complaint, the 2021-2022 Noblesville High School Student Handbook provided applicable rules regarding flyers. The 2021-2022 Handbook complete rule regarding posters provided:

---

[2] Pasko resigned on November 13, 2021, and the Facebook post on which she clicked "like" was not posted until November 24, 2021. Compare Ex. 511 (date shown at top by Patricia McKimmy Mahoney's name) and Ex. 577 – Pasko Dep., 22:3-14 (showing last date of employment with Noblesville Schools)]

Any materials posted at NHS must be posted only in the cafeteria and/or commons areas, and they should be removed after the date of the event. Posters must promote a school-sponsored event or have administrative approval to be posted.

If materials promote a non-school event, they must list the sponsoring group. The sponsoring group must be local, must be clearly named on the posters, and must be a non-for-profit organization. The event itself must be educational in nature.

[Ex. 34 - NHS Student Handbook 2021-22]

5.     The Noblesville Schools School Board is the final decisionmaker with authority to approve the provisions of—and any changes to—the Handbook. [Ex. 570 - McCaffrey Dep. II, 42:3-18]

6.     The guidance on what could be on student club call-out flyers was established and known by school administrators and club sponsors: Flyers for club call-out meetings were to have the name of the club and the date, time, and location of the meeting, and they could not contain anything disruptive to the school environment. [Ex. 578 - Swafford Dep., 34:18-35:12; Ex. 571- Mobley Dep. I, 15:13-19]

7.     Noblesville Schools did not permit students to hang posters on the walls without approval from an administrator. [Ex. 571 - Mobley Dep. I, 14:22-25]

8.     All approved posters had written on them a take-down date and the initials of the administrator that approved them. and were hung with blue tape. [Ex. 578 - Swafford Dep., 31:2-10; 19:19-20:20]

9.     In fall 2021, there were limited areas where students were permitted to hang physical posters. These included the main hallway of the freshman center, near bus entrances, the cafeteria, and near the auditorium. [Ex. 578 - Swafford Dep, 37:9-20]

### C. Noblesville High School Student Groups

10.     There are various types of student groups at Noblesville High School, including school clubs, student interest clubs, academic teams, extra-curricular activities, and co-curricular activities. [Ex. 570 - McCaffrey Dep. II, 49:17-21]

11.     School clubs, academic teams, extra-curricular activities, and co-curricular activities are school sponsored groups with a school-approved adult actively involved in organizing and running the group. [Ex. 576 - Affidavit McCaffery ¶ 10]

12.     Student interest clubs are founded by students who want to come together with other students of similar interests. Those groups are student-driven and student-led. An adult is present to supervise as the students use the school facilities, but the adult does not actively participate in the club. [Exhibit 581 – Email RE: Club List for Fall 2021]

13.     In fall 2021, Noblesville High School had several student interest clubs, including, but not limited to, Conservation Club, CRU (Campus Crusade for Christ), FCA (Fellowship of Christian Athletes), GSA (Gender and Sexuality Alliance), Key Club, Leo Club, Noblesville Young Democrats, Young Republicans, and Police Explorers. [Ex. 581 – Emails Re: Club List for Fall 2021]

### D. 2019 CRU Issue with adult involvement

14.     In 2019, Dr. McCaffrey received complaints that an adult participating in CRU meetings at NHS, along with a threat of litigation by the Freedom from Religion Foundation. Dr. McCaffrey investigated the complaints by watching videos of CRU meetings. He found that no adults spoke during the meetings and so had no cause to take any corrective action. [Ex. 570 - McCaffrey Dep. II, 135:5-136:18]

15.     Other than the 2019 complaint about CRU, there has been no other issue with suspected adult involvement in a student interest club since Dr. McCaffrey has been principal, until the issue arose with NSFL. [Ex. 570 - McCaffrey Dep. II, 132:9-15]

**E.  Noblesville Students for Life Formation**

16.     On August 3, 2021, E.D. and her mother met with Dr. McCaffrey to discuss forming NSFL, and Mrs. Duell audio recorded that meeting. [Ex. 579 - L. Duell Dep., 19:1-5; Ex. 567 - E.D. Dep. I, 13:4-23]

17.     E.D. told Dr. McCaffrey she wanted to start NSFL and relayed the club's pro-life mission statement. [Ex. 579, L. Duell Dep., 15:25-16:15; Ex. 554 - recording of meeting; Ex. 567 – E.D. Dep. I, 17:12-18:13]

18.     At the meeting with Dr. McCaffrey, Lisa Duell participated in the conversation about starting the club, including to:

    a.  Ask Dr. McCaffrey when the clubs fair would be ;
    b.  Ask Dr. McCaffrey what the process was for a speaker to come in and talk to the club;
    c.  Ask whether E.D. "fills out a form and talks to her sponsor, and that's it?" for a speaker to come in;
    d.  Ask whether NSFL would have a booth at NHS's activities fair, and whether E.D. should make something for the fair;
    e.  Help explain SFLA's involvement to Dr. McCaffrey by asking E.D. to clarify whether SFLA were making NSFL adhere to a code a conduct;
    f.  Ask E.D. whether she saw anything in the contract provided by SFLA about SFLA using photos of NHS; and
    g.  Engage in a back-and-forth conversation with Dr. McCaffrey about a prior situation with student photos showing up on an organization's website.

[Ex. 568 -  E.D. Dep. II, 18:12-25:10; 92:24-93:18; Ex. 554 – recording of meeting]

19.     Dr. McCaffrey told E.D. the next steps she needed to take to get NSFL approved and provided E.D. with the "Club Proposal Questions" that were required to be answered. [Ex. 567 - E.D. Dep. I, 16:21-17:8]

20.     E.D. completed and returned to Dr. McCaffrey the Club Proposal Questions. In her responses, E.D. advised the club would "empower students to knowledably and courageously speak about abortion [and] bring awareness to the abortion issue"; "bring awareness to the abortion issue and positively impact [E.D.'s] peers' respect and value for life and the unborn"; participate in "national pro-life days"; and provide speakers to "present on pro-life topic."  [Ex. 569 - McCaffrey Dep. I, 23:1-24:24; Ex. 567 - E.D. Dep. I, 21:5-22:2; Ex. 1 – Club Proposal Questions; Ex. 2 – E.D.'s Answers to Club Proposal Questions]

21.     After receiving E.D.'s answers to the Club Proposal Questions, Dr. McCaffrey approved NSFL as a student interest club. [Ex. 567 -E.D. Dep. I, 21:5-22:25]

22.     A few weeks later, NSFL had a booth at the fall 2021 activities fair on August 19, 2021, along with all other clubs, and E.D. spoke with students walking by about NSFL. [Ex. 567- E.D. Dep. I, 24:12-16; Ex. 568 - E.D. Dep. II, 9-16] E.D. manned the NSFL booth at the 2021 activities fair while wearing a shirt that stated, "I am the pro-life generation." The booth had a tri-fold poster display E.D. created with NSFL's mission statement and a sign that stated, "I am the pro-life generation." [Ex. 568 - E.D. Dep. II, 40:23-43:15; Ex. 558 – NSFL Instagram Post]

23.     Noblesville Schools did not prohibit E.D. from displaying any of the pro-life items at her booth. [Ex. 568 - E.D. Dep. II, 43:2-44:8]

**F.  Noblesville Students for Life Flyers**

24.     Approximately two weeks later, on August 31, 2021, E.D. emailed Ms. Mobley digital copies of the two flyers she wanted to post in the school to advertise the call-out meeting for NSFL. Both flyers contained photographs of protestors carrying signs that read, "Defund Planned Parenthood" and "I Am The Pro-Life Generation." The proposed flyers also contained

16

text that stated, "Pro-Life Students, It's Time to Meet Up!" and the following words followed

by blank spaces for the student to fill in: "Topic:," "When:," "Where:," and "Sponsored By:."

At the bottom of the page, there was a very small logo for Students for Life of America. [Ex.

14 - Emails RE "Flyers for my group" at 2-3]

25.    The flyers were not filled in and did not anywhere state "Noblesville Students

for Life" or "Call-out." [Ex. 14 - Emails RE "Flyers for my group" at 2-3]

26.    The next morning, on September 1, 2021, Ms. Mobley responded to E.D.'s email

with the proposed flyers as follows:

> We need flyers advertising that this is a 'Noblesville Students for Life' Club
> meeting location, date, and time. We do not need the pictures of the signage. For
> example, our Young Republican's [sic] club does not display items for the
> Republican Party. Their flyers just simply state the club name and meeting/call-out
> information. Then obviously at the club meeting and call-out, you guys can discuss
> whatever is your topic at hand.
>
> In the future, I will probably have you run these by Mr. McCauley first to get
> appropriate revisions made. After his approval, we can then get them to an
> administrator to approve prior to hanging in the halls.

[Ex. 14 - Emails RE "Flyers for my group" at 3-4]

27.    Ms. Mobley emailed Mr. McCauley to ask him to work with E.D. on a revised

version of the flyers. [Ex. 14 - Emails RE "Flyers for my group" at 4]

28.    Less than one hour later, Mr. McCauley sent an email to E.D. stating the

following:

> The best thing to do for the flyers is to simply put this info on them:
> Noblesville Students for Life Club
> Meeting Date: ???
> Meting time: ???
> Meeting location: ???
> Once you get the flyer finished, will you please email it to me so that I can
> approve it?

[Ex. 14 - Emails RE "Flyers for my group" at 4]

29.     Later that evening, E.D. informed Mr. McCauley in their email exchange that she wanted to use the template flyers from the Students for Life website. [*Id.* at 5] Mr. McCauley responded the next morning, September 2, 2021, at 9:29 a.m.:

> I think it is best just to have this info only on the flyers: (no pictures, etc.)
> Noblesville Students for Life Club
> Meeting Date: ???
> Meeting time: ???
> Meting location: ???
> Send me a pic of the final flyer and we'll get it figured out.

[Ex. 14 - Emails RE "Flyers for my group" at 4]

30.     On September 2, 2021, at 10:14 a.m., E.D. responded to Mr. McCauley stating, "Sounds good, thanks! I'll get to work on making the flyers." [Ex. 14 - Emails RE "Flyers for my group" at 4]

31.     The following morning, September 3, 2021, before school began E.D. requested a meeting with Mr. Luna. Mrs. Duell arrived at school to attend the unscheduled meeting, where E.D. showed Mr. Luna the same flyers she presented to Ms. Mobley. [Ex. 567- E.D. Dep. I, 46:3-7; 48:9-10; Ex. 573 - Luna Dep. I, 35:14-25; Ex. 573 - Luna Dep. I, 35:17-36:9]

32.     Neither E.D. nor Mrs. Duell informed Dr. McCaffrey or Mr. Luna of a family rule regarding E.D. being alone with adult males prior to Dr. McCaffrey's decision to temporarily revoke NSFL. [Ex. 573 - Luna Dep. I, 61:1-15; Ex. 569 - McCaffrey Dep. I, 87:20-88:1]

33.     Mr. Luna advised the flyer could not have a political photo of a "picket" with multiple signs reading "Defund Planned Parenthood." [Ex. 573 - Luna Dep. I, 40:8-21; 41:9-15] E.D. asked Mr. Luna if she could hang the flyers if she removed the "Defund Planned

Parenthood" signs. Mr. Luna said that "should" or "would possibly" work. [Ex. 567 - E.D. Dep. I, 49:23-50:4; Ex. 573 - Luna Dep. I, 42:1-16]

**G. Noblesville Students for Life Temporary Suspension**

34. Immediately after the meeting, Mr. Luna summarized the meeting with E.D. and her mother to Dr. McCaffrey and Ms. Mobley. [Ex. 573 - Luna Dep. I, 46:3-14; Ex. 569 - McCaffrey Dep. I, 105:4-23]

35. Mr. Luna advised his impression from the meeting with E.D. and Mrs. Duell was that it was a three-way conversation with Mrs. Duell driving the conversation. [Ex. 573 - Luna Dep. I, 45:17-47:9]

36. Ms. Mobley informed Dr. McCaffrey during the meeting that E.D. had already presented the same flyers to her for approval, that she had turned them down, and that there was a plan in place to correct them. [Ex. 569 - McCaffrey Dep. I, 103: 2-14]

37. Dr. McCaffrey and Ms. Mobley expressed concerns about Mrs. Duell's participation in E.D.'s meetings about NSFL. [Ex. 573 - Luna Dep. I, 62:19-63:20; Ex. 571 - Mobley Dep. I, 35:2-15]

38. After the discussion between Dr. McCaffrey, Mr. Luna, and Ms. Mobley, Dr. McCaffrey emailed Mrs. Duell. [Ex. 5 – McCaffrey's Email suspending club status 9/3/21] The email stated it was "unusual and unorthodox" for a parent to attend meetings with a child about starting a student interest club. He recounted that E.D. spoke with Ms. Mobley about her flyers and was told they were not appropriate for school, yet instead of revising the flyers, E.D. and her mother came in to talk to Mr. Luna about the club and the posters that were already denied by Ms. Mobley. Consistent with all advice that had been given to E.D., Dr. McCaffrey specified,

> A poster cannot contain any content that is political or that could disrupt the school environment. Club advertising posters only state the name of the club and the details of the meeting time and location. When the students actually meet, they are able to talk about their common interests.

Dr. McCaffrey expressed he was not confident that NSFL was a student-driven club and was removing the club's approval to meet in school. He offered that E.D. could apply to start NSFL again in January. [Ex. 5 – McCaffrey's Email suspending club status 9/3/21]

39.    The decision to revoke NSFL was Dr. McCaffrey's alone. [Ex. 569 - McCaffrey Dep. I, 108:3-7, 108:22-24; Ex. 570 - McCaffrey Dep. II, 128:18-22]

40.    Dr. McCaffrey informed Dr. Niedermeyer of his decision to revoke NSFL after he sent the Revocation Email to Mrs. Duell. [Ex. 569 - McCaffrey Dep. I, 131:10-15]

41.    Dr. McCaffrey, Ms. Mobley, and Mr. Luna are all pro-life, and their personal views on abortion align with the viewpoint and mission of NSFL. [Ex. 569 - McCaffrey Dep. I, 148:5-7; Ex. 571 - Mobley Dep. I, 41:21-43:1; Ex. 573 - Luna Dep. I, 58:15-19]

42.    NHS has previously had at least one pro-life club, and there is no evidence that any prior clubs were revoked or denied approval. [Ex. 569 - McCaffrey Dep. I, 147:7-21; Ex. 575 - Niedermeyer Dep., 50:16-51:3]

43.    Prior to fall 2021, Dr. McCaffrey had never encountered a situation where a parent was involved in assisting a student club or where a parent came to the school to sit in for the proposal meeting. [Ex. 569 - McCaffrey Dep. I, 39:16-19; 87:17-19]

44.    Prior to temporarily revoking NSFL, Dr. McCaffrey had never revoked a student interest club. [Ex. 569 - McCaffrey Dep. I, 106:19-21]

**H. Social Media discussion**

45.     After NSFL was suspended, Noblesville City Councilman Pete Schwartz and resident Patricia McKimmy Mahoney made posts to a Facebook group showing an email E.D. sent to Councilman Schwartz, and in responses hundreds of people took to social media to comment and discuss their views on what was appropriate in school. [Ex. 511- First Thread of Comments on Mahoney's Facebook Post; and Ex. 512 - Second Thread of Comments on Mahoney's Facebook Post]

46.     Stephanie Eads commented that she thought it was inappropriate for Councilman Schwartz to post E.D.'s email to him on a public forum [Ex. 37 - Facebook comment by Stephanie Eads]; Allison Schwingendorf-Haley liked a comment to Mahoney's post about adult involvement in the group [Ex. 24 - Facebook "like" by Allison Schwingendorf-Haley]; Beth Kizer liked a comment made by Byron Simpson about alternative ways for students to get out their messages  [Ex. 21 - Facebook Like by Beth Kizer]; Emily Patterson-Jackson commented on Mahoney's post noting that she had altered or deleted key parts of the original email and commented asking for the community's opinions on "Defund the Police" signs in schools [Ex. 45 - Facebook Comment by Emily Patterson Jackson; and Ex. 21 - Facebook comment by Emily Patterson-Jackson liked by Alison Rootes]; Alison Rootes liked Patterson-Jackson's comment about the "Defund the Police" signs [Ex. 21 - Facebook comment by Emily Patterson-Jackson liked by Alison Rootes]; Alexandra Snider Pasko unintentionally "liked" a comment by Michael Burks about his skepticism based on  the parent in the meeting and representation by legal counsel [Ex. 26 - Facebook comment "liked" by Alexandra Snider Pasko; Ex. 577 - Pasko Dep., 16:10-18:1]; and Grace Tuesca "liked" several posts on Instagram and Facebook that she agreed with or found funny. [Ex. 28 - Facebook

comment liked by Grace Tuesca; Ex. 29 - Instagram comment liked by Grace Tuesca; Ex. 30 - Instagram comment liked by Grace Tuesca; Ex. 31 - Facebook comment liked by Grace Tuesca; and Ex. 32 – Facebook posts liked by Grace Tuesca; Ex. 580 - Tuesca Dep., 22:13-38:15]

## II.       SUMMARY JUDGMENT LEGAL STANDARD

A "principal purpose" of summary judgment is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate when the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party need not produce evidence showing the absence of a genuine issue on which the nonmoving party bears the burden of proof. *Celotex Corp.*, 477 U.S. at 325. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the movant makes the requisite showing, the non-movant must come forward with specific evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 323. A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, courts "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

## III.     ARGUMENT

For purposes of making a more concise argument, Plaintiffs' claims can be discussed as five legal claims: (1) First Amendment, Fourth Amendment and Equal Access Act claims against Noblesville Schools related to the revocation of NSFL's club status; (2) a First Amendment claim against Noblesville Schools for refusing to allow E.D. to hang posters in the school stating, "Defund Planned Parenthood; (3) a First Amendment retaliation against (a) Noblesville Schools and four administrators for revocation of NSFL's status in retaliation for E.D.'s expressed pro-life views, and (b) seven teachers or staff for comments or likes on social media in retaliation for E.D.'s expressed pro-life view; (4) an Equal Access Act claim against 3 administrators for revoking "NSFL's status as a student organization" and "by denying Plaintiffs the right to conduct meetings due to the content of their speech." [Doc. 43, ¶352; Doc. 153, at 39]; and (5) an Article 1, Section 9, Indiana Constitution claim against Noblesville Schools and 5 administrators for revoking NSFL's status, thus "restricting [E.D's] expressive activity." [Doc. 43, at 59, ¶541] The undisputed evidence disproves each of Plaintiff's theories. Each of these five claims are addressed in turn below.

### A.  The revocation of NSFL was not the result of any policy or practice of Noblesville Schools or by a person with final policymaking authority, as required for Plaintiffs to succeed on Counts I-V and VII under *Monell.*

Plaintiffs first allege that when Noblesville Schools suspended NSFL's status as a student interest club, it violated the First Amendment right to freedom of speech and freedom of association, the Fourteenth Amendment right to equal protection and due process, and the Equal Access Act ("EAA"), 20 U.S.C. §4071(a). The First Amendment claim also encompasses a

retaliation claim, alleging the club's status was revoked because of E.D's exercise of her First Amendment rights. None of Plaintiffs' claims against Noblesville Schools for the temporary revocation of NSFL can survive under *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658 (1978).

Pursuant to *Monell* a municipal entity may not be held responsible for a EAA or constitutional[3] violation unless the "deprivation was the result of the [entity's] official policy, custom, or practice." *Id*. There is no respondeat superior liability under *Monell. Id.* at 694. To succeed on a *Monell* claim, a plaintiff must show that a constitutional violation resulted from one of the following: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)). As such, Plaintiffs must show an express policy of Noblesville Schools, a widespread practice of Noblesville Schools or a person with final policymaking authority for Noblesville Schools caused the temporary revocation of NSL's club status.

1. **NSFL was not temporarily revoked as the result of any express policy of Noblesville Schools.**

Dr. McCaffrey was not acting pursuant to any express policy when he temporarily revoked NSFL. Indeed, Plaintiffs assert it was a *lack* of express policies that resulted in the revocation of NSFL. [Doc. 43, p. 24, ¶247] Noblesville Schools may be liable under *Monell* for the failure to enact a policy. S*ee Watson v. Indiana Dep't of Correction*, No.18-02791, 2020 WL 5815051, at

---

[3] As noted by the Court in Doc. 98, at 13, FN3, The Equal Access Act is enforceable by a private right of action under § 1983 and Plaintiffs' Equal Access Act claim is therefore governed by the § 1983 standards. *See, e.g.*, *Carver Middle School Gay-Straight Alliance v. Sch. Bd. of Lake Cnty., Fla.*, 249 F. Supp. 3d 1286, 1290 (M.D. Fla. 2017) (holding that "42 U.S.C. § 1983 supplies a procedural mechanism or cause of action for litigating violations of the Equal Access Act").

*4 (S.D. Ind. Sept. 30, 2020). "But proving *Monell* liability based on an absence of policy is difficult, because 'a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous,' and, therefore 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the action of its employee.' " *Id*. at *4. To sustain such a claim, Plaintiffs must show that Noblesville Schools had "actual or constructive knowledge that its agents [such as those approving student club status] *will probably* violate constitutional rights' in the absence of a [relevant] policy." *Id*. at *4 (emphasis added). In addition, Plaintiffs must provide "more evidence than a single incident to establish liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (noting the Supreme Court's caution against drawing an inference that "the absence of a policy might reflect a decision to act unconstitutionally ....").

Plaintiffs make no such showing here. Noblesville Schools had no reason to know or believe that, without a formal policy regarding club formation, administrators would permit, deny, or revoke a club's status based upon the club's political viewpoint. To the contrary, Noblesville Schools had reason to believe that clubs would be permitted regardless of political viewpoint. Noblesville Schools had multiple student interest clubs with a range of ideologies, including Young Republicans, Young Democrats, CRU (Campus Crusade for Christ), FCA (Fellowship of Christian Athletes), and GSA (Gender and Sexuality Alliance). [Ex. 581 - Email Re: Club List for Fall 2021] No club had previously been revoked. [Ex. 569 - McCaffrey Dep. I, 106:19-21] Plaintiffs' claims rest upon this single incident, which is not sufficient to support a *Monell* claim.

**2. NSFL was not temporarily revoked as the result of any widespread practice of Noblesville Schools.**

There is no evidence of any widespread practice that resulted in Dr. McCaffrey's decision to temporarily revoke NSFL. "The fact that a particular official—even a policymaking official—

has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Dr. McCaffrey had never revoked a student interest club prior to revoking NSFL. One instance of Dr. McCaffrey using his discretion to temporarily revoke a student club does not establish a widespread practice. *See Vergara v. City of Waukegan*, 590 F. Supp. 2d 1024,1041 (N.D. Ill. 2008) (two instances of city failing to admit members of the public on a first-come, first-served basis was not enough to establish an unconstitutional policy of viewpoint discrimination, "even with the required benefit of favorable inferences"). There is no evidence that Noblesville Schools had an unconstitutional, widespread practice to warrant municipal liability in this case.

**3. NSFL's club status was not revoked by a person with final policymaking authority.**

NSFL was not revoked by a person with final policymaking authority. Even where a school board has delegated administration of a school to a principal or other administrator, "[t]he final decisionmaking authority of the school district is lodged in the district's school board." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). There is no evidence that any member of the Noblesville Schools School Board caused NSFL to be revoked for the remainder of the fall 2021 semester. Dr. McCaffrey is not a person with final policymaking authority under *Monell*. Dr. McCaffrey made the decision to temporarily revoke NSFL's club status, and Dr. McCaffrey informed others of his decision after he sent the revocation email to Mrs. Duell. [Ex. 569 - McCaffrey Dep. I, 108:3-7, 22-24; Ex. 570 - McCaffrey Dep. II, 128 at 18-22]

### 4. Lack of *Monell* liability defeats Plaintiffs' claims against the School under the First Amendment, Fourteenth Amendment, and Equal Access Claims.

Each of Plaintiffs federal municipal claims are based on the revocation of NSFL's club status on September 3, 2021. [Doc. 43, Count I (Right of Association); Count II (Right of Freedom of Speech); Count III (Due process); Count IV (Equal Protection); Count V (Retaliation); Count VII (Equal Access Act)]  If the underlying wrongful act or alleged injury at issue – the revocation of the club's status – was not caused by an express policy, a widespread custom, or the action of a final policymaker, then no Equal Access Act or constitutional claim – regardless of the alleged violation – cannot survive. Municipal liability for the alleged violations cannot exist independent of an unconstitutional policy, custom, or action of a final policymaker that caused the alleged wrongful act or injury.

The undisputed facts show that Dr. McCaffrey gave E.D. detailed instructions on how to get started and how student interest clubs worked at NHS. He approved NSFL with full knowledge of its pro-life stance, and E.D. participated in the school's club fair promoting NSFL with pro-life materials. A month later, NSFL's status was suspended because of E.D.'s and her mother's conduct after E.D. was told she could not hang flyers that were templates from the national Students for Life of America ("SFLA") website. E.D. was told the flyers were denied because they contained photographs of political protestors holding signs stating, "Defund Planned Parenthood," and did not anywhere include the name "Noblesville Students for Life." E.D. was given specific instructions from NHS Assistant Principal Janae Mobley and NSFL's faculty sponsor on how to create an appropriate flyer. E.D. stated she understood and would make the appropriate flyer. Instead of doing so, she and her mom went to NHS the next morning and met with a different

administrator, Mr. Luna, to seek approval from him, in a classic game of "if mom says no, ask dad."

Dr. McCaffrey learned E.D. ignored Mrs. Mobley's instructions and went to Mr. Luna to get around Mrs. Mobley's denial, and that Mrs. Duell had participated in a second meeting about NSFL and assisted E.D.'s attempt to defy Ms. Mobley's directions. Based on that conduct, Dr. McCaffrey decided to suspend NSFL's ability to meet on campus through the remainder of the semester. This was a unique situation. In Dr. McCaffrey's time as principal, he had not had a parent participate in a club formation meeting or had a parent and student attempt to circumvent an administrator's denial of a call-out poster by going to a different administrator for approval. [McCaffrey Dep. I, 94:22-95:2; 91:21-92:3: "Mom and E. came in to meet with Mr. Luna, and in that meeting, they tried to get the poster approved that was already denied by Ms. Mobley. I view that as an attempt at insubordination which teenagers do. . . I've never had an adult help, try to help a student be insubordinate."] As the Principal, Dr. McCaffrey took action that he believed was appropriate and was within his discretion, to address this unique circumstance.

Because no express policy, widespread practice, or person with final policymaking authority caused the temporary revocation of NSFL, Plaintiffs cannot succeed on their freedom of association, freedom of speech, retaliation, due process, equal protection, and Equal Access Act claims based on the revocation of NSFL's status.

**B. Noblesville Schools' practice related to club flyers did not violate Plaintiffs' First Amendment right to freedom of speech.**

Plaintiffs allege Noblesville Schools violated E.D.'s right to free speech by refusing to allow E.D. to hang posters in the school stating, "Defund Planned Parenthood." [Doc. 43 at 25-28] Noblesville Schools had a practice and custom of not permitting flyers advertising club meetings

to contain political speech. This practice is not itself unconstitutional, and thus does not provide a basis for *Monell* liability.

Plaintiffs had no First Amendment right to hang political messages on school walls. Noblesville Schools' refusal to permit E.D. to hang flyers with political speech did not violate Plaintiffs' rights under the First Amendment.

### 1. NHS hallway walls were not a public forum.

Where a forum for expression is not a "public forum" within the meaning of First Amendment jurisprudence, the government has the ability to place reasonable limits on speech. *Minnesota Voters All. v. Mansky*, 201 L. Ed. 2d 201, 138 S. Ct. 1876, 1885 (2018) (citing *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Public school facilities are not considered public forums unless "school authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the public' or by some segment of the public, such as student organizations." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Perry Ed. Assn.*, 460 U.S. at 46, 47, n. 7). On the other hand, "[i]f the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id.* (citing *Perry Ed. Assn.*, 460 U.S. at 46, n.7).

The U.S. Supreme Court's decision in *Hazelwood School Dist. V. Kuhlmeier* is instructive. In that case, a high school journalism class published issues of a student newspaper approximately every three weeks. *Id.* at 262. Prior to publication, the teacher of the class would send proofs to the principal for him to review. *Id.* at 262. In one of the issues, the principal objected to two stories—one about abortion, the other about divorce—because of the sensitivity of the topics and

concern that the students highlighted in the stories would be identified. *Id.* at 263. Reynolds reasonably believed the only option for deleting the two stories, and still publishing the issue before the end of the school year, was to withhold the two pages containing those two stories from the publication, although there were other, non-objectionable articles included on those pages. *Id.* at 263. After being forced to withhold the two pages from the newspaper, the journalism students filed a lawsuit alleging violations of the First Amendment. *Id.* Although the students alleged they could publish "practically anything" in the newspaper, the teacher and principal's respective authority over the paper—and the newspaper's place in the educational curriculum—showed the school reserved the forum for its intended purpose as a "supervised learning experience for journalism students." *Id.* at 268-270. Thus, the paper was not a public forum, and the school could place reasonable restrictions on what could be published. *Id.*

Here, Noblesville Schools specifically limited the information and materials that students could post on the walls of NHS. All flyers had to be approved by an administrator, and administrators reserved the walls for certain communicative purposes. With regard to student organizations, the purpose was to notify students of the name of the club and the date and location of the meeting or event. The general public was not permitted to post flyers on school walls. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985); *see also Perry Educ. Assn.*, 460 U.S. at 47 (school's internal mail system was not a public forum where it was not open to the general public). Plaintiff has not identified any approved flyers that go further than informing students of the existence of a club, relevant date/time information, and a basic description of the club. Permitting these flyers to be hung on the walls does not obligate

Noblesville Schools to open its walls to the entire gamut of political messaging. Mrs. Mobley explained the distinction during her deposition:

> Q. So my question is, is the rule that a flyer cannot have anything political in nature, or that it can't take a political stance, I guess?
>
> A. I would say both.
>
> Q. Neither is allowed.
>
> A. Correct.
>
> Q. Okay. Isn't like the Young Republicans political in nature? Like, you know, they take a stance on—
>
> A. Well, that is the name of their club.
>
> Q. So that makes it allowed.
>
> A. Well, I say in [the email to E.D.], the club can be listed, but they don't post or display items for the Republican party.
>
> Q. Okay. Can you explain what you mean by like "items"?
>
> A. They're not posting signage that say "Vote for Trump" or "Build that wall" or "Let's go, Brandon." They're not putting any pictures or signage up; they're putting "Noblesville Young Republicans."

[Ex. 571- Mobley Dep., 61:18-62:12] The undisputed evidence shows the walls of Noblesville High School was a non-public forum.

**2. Noblesville Schools' practice of restricting political content on flyers was reasonable.**

The government's restriction on speech in a non-public forum need only be shown to be reasonable. Specifically, educators may exercise control over school-sponsored expressive activities so long as their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. School-sponsored activities include "student publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271.

Hanging flyers on school walls—related to clubs that meet during school hours and on school grounds—is such an expressive activity. When parents and other members of the public

31

enter a school facility for sporting events, parent-teacher conferences, or any other reason, they might erroneously attribute political messaging on a flyer to the school district or the school itself. The U.S. Supreme Court specifically held that a school "must [] retain the authority to refuse to . . . associate the school with any position other than neutrality on matters of political controversy." *Id*. at 272. While the words "Noblesville Students for Life" would have simply informed students and others that such a club exists, the words "Defund Planned Parenthood" reflect a specific stance on a political controversy that could cause unnecessary disruption within the school—particularly when no other club was permitted to make political statements on their call-out flyers. It is only when a school's restriction on expression in a non-public forum "has no valid educational purpose" that the First Amendment is directly implicated. *Id*. at 273. The evidence shows Noblesville Schools had a valid educational purpose for refusing to permit political content in flyers, including to avoid becoming a facilitator of warring political messages that could disrupt the learning environment. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 467 (7th Cir. 2001) ("Order and discipline are part of any high school's basic educational mission; without them, there is no education.").

### 3. Noblesville Schools did not violate the First Amendment when it refused to let E.D. hang flyers that said "Defund Planned Parenthood."

Especially where the custom is not itself evidence of wrongdoing, "there must be an 'affirmative link' between the custom at issue . . . and the constitutional deprivation alleged." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). The Seventh Circuit Court of Appeals has interpreted this to mean "there must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged

unconstitutional violation." *Id.* This requires evidence of "a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts." *Id.* at 205. No such evidence exists here as there is no affirmative link between Noblesville Schools' practice of not permitting political messages on club flyers and discrimination among political viewpoints. The disputed evidence shows it was Noblesville Schools' custom to disallow *all* political statements, not just political statements of a certain viewpoint.

To the extent Plaintiffs seek to rely on the Black Student Union flyer to demonstrate a discriminatory practice of permitting some political messages and refusing others, there is nothing to support such a practice existed. First, there is no evidence that any administrator had seen or approved the BSU poster. To the contrary, the poster itself suggests it was not approved by an administrator. There is no take-down date written on the poster, no administrator's initials indicating approval, it was not hung with blue tape, and it was not hung in one of the approved areas of the school. [Ex. 578 - Swafford Dep., 31:2-10; 19:19-20:20] Second, the BSU poster did not contain political speech. As Ms. Mobley testified, considering clip art of fists to be political speech requires a "logical jump" that is not necessary with the statement "Defund Planned Parenthood." There is no evidence to support Plaintiffs' assertion that three raised fists, particularly three fists of different skin tones, constitute a political statement. Likewise, there is no evidence that Noblesville Schools considered it a political statement. Thus, the presents of the BSU flyer on a wall within the one million square feet of NHS is not evidence of that Noblesville Schools allowed flyers with political statements to be hung in the school. [Ex. 570 - McCaffrey Dep. II, 37:17-19] Rather, at best, it is evidence that the Noblesville Schools administration cannot always be in every corner of the building and see everything hung on its walls, without or without permission.

### C. Plaintiffs cannot make a *prima facie* case of First Amendment retaliation.

Plaintiffs allege First Amendment retaliation by two groups of defendants, each based on a different set of actions. First, Plaintiffs allege Noblesville Schools and Dr. Niedermeyer, Dr. McCaffrey, Ms. Mobley, and Mr. Luna (in their individual capacities) suspended NSFL's status in retaliation for E.D.'s expressed pro-life views. Additionally, Plaintiffs allege Snider-Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads commented on or liked social media posts/comments in retaliation for E.D.'s expressed pro-life views.

To establish a prima facie case of First Amendment retaliation, Plaintiffs must establish that: "(1) [their] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [them]; and (3) there was a causal connection between this adverse action and the protected speech." *R.Z. ex rel. Zimmer v. Carmel Clay Sch.*, 868 F. Supp. 2d 785, 796 (S.D. Ind. 2012), *dismissed* (July 20, 2012) (citing *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). The evidence does not support a First Amendment retaliation claim under *Monell*,[4] and Plaintiffs cannot meet the elements of this claim with regard to any of the individual-capacity Defendants.

### 1. Individual-capacity Defendants Niedermeyer, Mobley, and Luna did not revoke the club's status.

Plaintiffs' retaliation claim against Niedermeyer, Mobley, and Luna is based on their alleged retaliatory act of revoking NSFL's status. However, the undisputed evidence shows that none of them participated in the revocation. The evidence shows Dr. McCaffrey, alone, made the

---

[4] As discussed *supra*, there is no policy, widespread custom, or act of a final decisionmaker that caused the revocation of NSFL's club status. Likewise, there is no evidence in the record of any policy, custom, or final decisionmaker's action of retaliation for forming a student interest club. Without such policy, custom, or action of a decisionmaker, there can be no alleged unconstitutional retaliation that caused the revocation of the club's status.

decision to remove NSFL's approval to meet at school for the remainder of the fall 2021 semester. As there is no evidence that Dr. Niedermeyer, Ms. Mobley, or Mr. Luna had any involvement in the alleged retaliatory conduct, there can be no basis for a First Amendment retaliation claim against them.

## 2. Dr. McCaffrey did not revoke the club's status because of the club's political views on abortion.

Dr. McCaffrey temporarily revoked the club's status. But he did not do so in retaliation for the club's political stance on abortion. The evidence refutes the contention that Dr. McCaffrey's decision to temporarily revoke NSFL was in retaliation for protected speech. As an initial matter, Dr. McCaffrey—who is himself pro-life—permitted E.D. to start NSFL with complete knowledge of the Club's mission and message.

The undisputed evidence shows Dr. McCaffrey made the decision to remove approval of NSFL immediately after his discussion with Mr. Luna and Ms. Mobley, which took place after E.D. and Mrs. Duell's meeting with Mr. Luna. The only information discussed prior to Dr. McCaffrey deciding to "press pause" on the club was E.D.'s defiance of Ms. Mobley's flyer instructions and Mrs. Duell's presence at the two meetings to discuss NSFL. Dr. McCaffrey, Mr. Luna, and Ms. Mobley all testified consistently when asked by Plaintiffs' counsel what was discussed during this meeting:

> A:      I just remember talking to Mr. Luna that the sign had already been denied by Ms. Mobley and that he needed to get out of that situation cause it's not something that he needed to be involved in. And he said "All right."
>
> Q:       What did Ms. Mobley say to you during that meeting?
>
> A:      To the best of my recollection, she said that there was already a plan to correct the sign; so she wasn't sure why that was brought up with Mr. Luna.

[McCaffrey Dep. II, 103:2-14] (cleaned up).

A:    Not much other than the fact that it was the second meeting Mom had attended and that I already not approved these flyers and was waiting on a revision and then that those same flyers were brought in to be approved by Mr. Luna . . . [S]he had already received a "no," and seeking a different administrator for a "yes" wasn't really the appropriate way to go about getting the flyers approved and getting her club to happen.

[Mobley Dep. II, 35:5-15]

A:    [McCaffrey and Mobley] just asked what was discussed. And that is when I, you know, told them, "Here is what we talked about." . . .

Q:    Did you summarize the meeting with E. to [McCaffrey] and [Mobley]?

A.    Yeah. Mm-mmm.

Q:    Did they raise any concerns?

A:    They just—concerned about Mom's involvement.

[Lune Dep. II, 46:2-17] There is simply no evidence that Dr. McCaffrey revoked NSFL based on the message contained in the proposed flyers or NSFL's political speech. Plaintiffs cannot meet the "causal connection" element of their First Amendment retaliation claim against Dr. McCaffrey in his individual capacity.

3. **Individual-capacity Defendants Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads did not take adverse action against Plaintiffs under color of law that was.**

With regard to Plaintiffs' allegations that the remaining individual-capacity Defendants, each current or former teachers or staff members of Noblesville Schools, Plaintiffs' claims have no support in the evidence. As an initial matter, engagement in a social media post is not conduct taken "under color of law"—a necessary element of a section 1983 claim. "Action is taken under color of state law 'when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (quoting *Honaker v. Smith*, 256 F.3d 477, 484–85 (7th Cir.

2001)). Defendants' alleged social media engagement is wholly unrelated to their employment or former employment with Noblesville Schools. As the Seventh Circuit has explained, "Section 1983 does not cover disputes between private citizens, even if one happens to be an officer." *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016). Even if one were to generously give credence to Plaintiffs' contention that the Defendants' social media interactions were related to NSFL's pro-life viewpoint, a foundational element of Plaintiffs' §1983 claim against them is not met.

For purposes of First Amendment retaliation, an action is adverse if it is "likely [to] deter a person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). Where the alleged adverse action is itself speech, that "retaliatory speech is generally actionable 'only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action will immediately follow.'" *Black v. Clarke*, 285 F. Supp. 3d 1070, 1081 (E.D. Wis. 2018) (quoting *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016)). There is no evidence of any threatening, coercing, or intimidating speech by any Defendant, let alone speech relating to a potential punishment, sanction, or adverse regulatory action.[5] Plaintiff was clearly not deterred from speaking out about NSFL, as she has intentionally publicized this lawsuit, including through media entities outside the Noblesville and Indianapolis areas. [Ex. 568 - E.D. Dep. II, 76:6-83:6]

---

[5] Plaintiffs' inclusion of the current or former teachers and staff members is arguably more adverse—in a general sense—than any social media "likes" or comments undertaken by those individuals, whose names have appeared in multiple news articles that now populate when their names are searched online. Of note, the evidence shows Alexandra Snider-Pasko was not even employed by Noblesville Schools on the date of her alleged Facebook "like." Summary judgment for all the Defendants is proper, but Plaintiffs' continued pursuit of damages against Pasko further demonstrates the overall frivolousness of their claims as a whole.

4. **Even if Plaintiffs' First Amendment retaliation claims against the individual-capacity Defendants survived, the individual Defendants are entitled to qualified immunity.**

In §1983 cases against government actors in their individual capacities, qualified immunity gives those individuals "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *See Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012) (quotations omitted). Qualified immunity requires dismissal of a plaintiff's claim for civil rights violations unless: (1) the plaintiff "come[s] forward with facts that, when viewed in a light most favorable to him, constitute a violation of a federal constitutional right, and (2) the right was 'clearly established' at the time of the alleged violation." *Siddique v. Laliberte*, 972 F.3d 898, 903 (7th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Plaintiffs bear the burden of demonstrating a clearly established right through firm precedent, particularized to the facts of the case, that places the question beyond debate. *Id.* (citations omitted). The right must be defined "carefully, and at the right level of detail," rather than generally. *Id.* (citing *Frederickson v. Landeros*, 943 F.3d 1054, 1059 (7th Cir. 2019).

Here, none of the individual-capacity Defendants had any basis for concluding their conduct was a violation of Plaintiffs' First Amendment rights against retaliation. The rights Plaintiffs seek to assert under Count V are best defined as rights against (1) temporary revocation of a student club based upon perceived rule violations, and (2) social media comments or "likes" related to that revocation. To the extent that either of these actions constitute First Amendment retaliation, there is no precedent to guide a reasonable person to this conclusion. Defendants are entitled to qualified immunity on Plaintiffs' individual-capacity, First Amendment retaliation claims.

**D. The individual Defendants did not violate the Equal Access Act because the NSFL's temporary revocation was not on the basis of the speech at NSFL meetings.**

Plaintiffs allege that Dr. McCaffrey, Ms. Mobley, and Mr. Luna violated the Equal Access Act by revoking "NSFL's status as a student organization" and "by denying Plaintiffs the right to conduct meetings due to the content of their speech." [Doc. 43, ¶352; Doc 153, at 39] As shown *supra*, Ms. Mobley and Mr. Luna were not involved in the decision to temporarily remove NSFL's ability to meet at school. Dr. McCaffrey made the decision and took the action on his own. Thus, there can be no Equal Access Act claim against Mobley or Luna based on the revocation of the club's status.

With regard to Dr. McCaffrey's decision to temporarily revoke NSFL's status, there is no evidence that his decision was made "merely on the basis of the content (e.g. religious) of the speech at meetings of the group." *See Gernetzke*, 274 F.3d at 466 (The Equal Access Act "forbids a school to deny equal access to its premises to a student group merely on the basis of the content (e.g. religious) of the speech at meetings of the group.") *See also* 20 U.S.C. §4071(a). The evidence shows McCaffrey revoked the club's status out of concern for parent-assisted insubordination. The evidence shows Dr. McCaffrey was concerned Mrs. Duell's involvement could expose the school to legal liability in the wake of the 2019 CRU situation. These are permissible reasons for club revocation under the Equal Access Act, which provides that "[n]othing in [the Act] shall be construed to limit the authority of the school . . . to maintain order and discipline on school premises." 20 U.S.C. §4071(f).

In *Gernetzke*, a Seventh Circuit case from 2001, a high school principle forbade the school's Bible Club from painting a large cross on a hallway wall as part of a larger mural. *Id.* at 466. The principle was concerned that having so salient a Christian symbol on the school wall

would invite a lawsuit under the Establishment Clause and might also require him to approve murals of a Satanic or neo-Nazi character, which would cause an uproar. *Id.* The principle also refused to allow one of the club's members to distribute religious literature at school. *Id.* Two members of the club sued the principal, the superintendent, and the school district under the Equal Access Act. *Id.*

The Seventh Circuit. Court of Appeals held there was no evidence of discrimination against the Bible Club. *Id.* The court found the principal's conduct was motivated by fear of a lawsuit and of inciting ugly conflicts among students. *Id.* The principal had also previously rejected a group's request to paint a mural containing a swastika and forbade mention of a specific brand of beer in a mural proposed by the Students Against Drunk Driving. *Id.* According to the Court, the evidence showed the principle was "discriminating not against religion but merely against displays, religious or secular, that he reasonably believed likely to lead to litigation or disorder." *Id.* The court further held that the principle's decision was insulated from liability under the Act's preservation of a school's ability to maintain order and discipline on school premises. *Id.* at 467.

Here, Dr. McCaffrey temporarily revoked NSFL because of what he deemed "the classic Mom said 'no' so go ask Dad type scenario" of insubordination. [Ex. 570 - McCaffrey Dep. II, 96:1-7] Additionally, Dr. McCaffrey was concerned about the legal ramifications if an adult was involved in the operation and messaging of the student club. [Ex. 569 - McCaffrey Dep. I, 106:22-107:3]

The Seventh Circuit, in *Gernetzke*, expressed "doubts about the appropriateness of litigation that is intended, whether by the friends of religion or by its enemies, to wrest the day-to-day control of our troubled public schools from school administrators and hand it over to judges and jurors who lack both knowledge and responsibility for the operation of the public schools."

274 F.3d at 467. This consideration gets to the heart of the present lawsuit. Similar to E.D., Gernetzke wrote in her diary about the "exciting" situation of suing her school: "I'm suing Kenosha Unified School District #1... The law suit is getting very interesting. KUSD is getting themselves deeper in cow dung than they realize!" *Id.* at 468. Both students brought lawsuits because they saw an opportunity to be a public hero for their causes and to forcibly throw their schools, teachers, and administrators into the existing cultural discourse about political issues, not because there was actual evidence of discrimination.[6] To quote the Seventh Circuit, "Do we really need this?" *Id.*

### E. Plaintiffs are not entitled to relief under Article 1, Section 9 of the Indiana Constitution.

Plaintiffs allege Noblesville Schools, Dr. Niedermeyer, Dr. McCaffrey, Ms. Mobley, Mr. Swafford, and Mr. Luna violated Article 1, Section 9 of the Indiana Constitution, by revoking the NSFL's status, thus "restricting [E.D.] expressive activity." [Doc. 43, at 59, ¶541] As noted in the Court's Order on the Motion to Dismiss [Doc. 98], Plaintiffs cannot seek damages and can only seek an injunction and declaratory relief. In the Amended Complaint, Plaintiffs seek a "declaration that the Defendants violated Indiana Constitutional [sic] Article 1, Section 9 Freedom of Speech

---

[6] During fall and spring of the 2021-2022 school year, E.D. and adults in her life intentionally publicized allegations of discrimination against the Defendants. E.D. wrote to her city council representative, which led to Patricia Mahoney's Facebook post referenced in Plaintiffs' Amended Complaint. She did interviews with Real News Michiana, the Mock and Rob Show on 93.1 FM WIBC, and Corpus Christi for Unity and Peace. [Ex. 566 - E.D.'s Responses to Defendants' Request for Production No. 18] Her pastor, Micah Beckwith, published an article in the Noblesville Times titled "What's Up with Discrimination at Noblesville High School?" Students for Life of America published multiple blog posts with quotes from E.D. and incorrectly reported to IndyStar that a "partial agreement" had been reached to allow NSFL to start back up again in February 2022. [https://www.indystar.com/story/news/local/marion-county/2021/12/22/noblesville-high-student-sues-school-over-anti-abortion-club-dispute/8994841002/]

protections," "a declaration that NSFL is a valid student group at NHS," and an "injunction against NHS' revocation of the student organization NSFL." [Doc. 43 at 63, ¶f-h]

Once again, there is no evidence to support the assertion that Dr. Niedermeyer, Ms. Mobley, Mr. Luna, or Mr. Swafford revoked NSFL's club status. As such, there is no basis for finding them liable under any theory of law for a claim based on the club's revocation. As to the claim against Noblesville Schools and McCaffrey, there is no evidence to support the alleged violation and the requested relief is unnecessary and inappropriate.

To succeed under Article I, § 9 of the Indiana Constitution, Plaintiffs must show (1) the state has restricted Plaintiffs' expressive activity, and (2) the restricted activity constitutes an "abuse" of the right to speak. *See Shoultz v. State*, 735 N.E.2d 818, 825 (Ind. Ct. App. 2000). If the restricted activity is political speech, the state must demonstrate that it has not "materially burdened" the claimant's opportunity to engage in political expression. *Id.* For the same reasons the U.S. Supreme Court has taken a cautious approach to interfering with educators' day-to-day decisions about student affairs and discipline, the Court should not find Indiana's Constitution requires Noblesville Schools to permit a club to meet on school property when the club's president failed to follow instructions on the club's call out flyer, sought an end-run around administrators, and had the appearance of adult participation. There is no support for the assertion that allowing such restrictions on clubs is an abuse of the right to speak.

Finally, "injunctive relief is improper when the applicant cannot demonstrate the present existence of an actual threat that the action sought to be enjoined will come about." Nor is injunctive relief to be used "simply to eliminate a possibility of a remote future injury." *Kennedy v. Kennedy*, 616 N.E.2d 39, 42 (Ind. Ct. App. 1993). Similarly, "a court cannot grant declaratory relief when there is no 'immediate and definite governmental action or policy that has adversely

affected and continues to affect a present interest.'" *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty., Fla.*, 842 F.3d 1324, 1330 (11th Cir. 2016) (citing *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974)). A desire for vindication, alone, does not justify injunctive or declaratory relief.

An "injunction against NHS' revocation of the student organization NSFL" is not necessary. There is no action to enjoin – NSFL has been an active student club since January 2022 and there is no evidence of an actual threat to NSFL's club status. The club' status was revoked because of E.D. and her mom's actions, not because of an immediate and definite governmental policy. Moreover, injunctive relief in the form of a "declaration" that McCaffrey's prior decision (in effect from September 3, 2021 to January 2022) violated the Indiana Constitution or that NSFL is a "valid student group" is inappropriate. Such a declaration would serve no purpose and provide no remedy.

## IV.     CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment as a matter of law on each of Plaintiffs' claims against them. Accordingly, Defendants respectfully request that summary judgment be entered in their favor with respect to all of Plaintiffs' claims. Because such a ruling disposes of all remaining claims against all parties, Defendants also request the Court to enter final judgment in their favor.

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs moved for summary judgment on each of their claims. Summary judgment for the Plaintiffs is unwarranted for the reasons summary judgment *is* warranted for the Defendants. Defendants incorporate those arguments in response to Plaintiffs' Motion.

## I. STATEMENT OF MATERIAL FACTS IN DISPUTE

Defendants do not contend there remain material facts in dispute precluding summary judgment for the Plaintiffs, but rather that the undisputed facts warrant summary judgment for the Defendants, instead. The following statements in Plaintiffs' "Statement of Material Facts not in Dispute," which are potentially determinative,[7] have no support in the evidence or are not proper for designation as facts. The statements in Plaintiffs' brief are not properly designated facts supported by admissible evidence as required by Local Rule 56-1(e).

14.      Plaintiffs state Mrs. Mobley "failed to provide a clear reason why" she did not approve NSFL's proposed flyers. This statement is contrary to the undisputed evidence. As shown in [Ex. 14 – Emails RE: "Flyers for my Group"], E.D. was told specifically what needed to be done to fix the flyers and E.D. responded, "Sounds good, thanks! I'll get to work on making the flyers." E.D cannot dispute her own statement, by now claiming in this litigation that she was "unclear" on what needed to be done. [Ex. 14 – Emails RE: "Flyers for my Group"]

22.      Plaintiffs claim Mr. Luna provided E.D. no information about rules and politics related to advertising flyers. The deposition testimony cited by Plaintiff does not support that statement. E.D. testified that Mr. Luna told her the flyers were not appropriate because they had a political photograph stating "Defund Planned Parenthood" and that the flyers should be fine if E.D.

---

[7] Plaintiffs' Statement of Material Facts Not in Dispute contains numerous facts with no support from the evidence, facts that are contrary to the evidence, immaterial facts, and conclusory statements couched as facts. Such statements should not be considered undisputed facts for purposes of the cross motions for summary judgment. For instance, Plaintiffs' Statements 49-56 relate to policies and procedures put in place for the 2022-2023 school year. None of this information is material to the issues of whether, in fall 2021, the Defendants violated Plaintiffs' rights by refusing to allow them to hang a poster with political speech and by temporarily revoking approval of NSFL. Facts that were unknown to the Defendants at the time they made their decisions are also immaterial, such as E.D.'s family rule regarding one-on-one meetings with adult males, which was never communicated to Dr. McCaffrey or Mr. Luna.

took out those photos. E.D. understood these instructions, as she stated that after the meeting, she planned to remove the "Defund Planned Parenthood" signs from the flyers. [Ex. 567 - E.D. Dep. I, 48:9-51:10]

31. Plaintiffs claim Noblesville Schools administrators "later" voiced concerns that NSFL was not student-led and that the proposed flyers were not appropriate, and argues those reasons were "illusory." This statement is argumentative and contrary to the undisputed evidence. All evidence shows those concerns were present before the club's revocation and, indeed, were the reason for the revocation. The club's status was revoked on September 3, 2021. The issue with the appropriateness of the flyers first arose on August 31, and the meeting that email revoking the club's status discussed the concerns about the club not being student-led as a basis for the revocation. [Ex. 5 - McCaffrey's email suspending club status 9/3/21; Ex. 14 – Emails RE: "Flyers for my group" 8/31/21-9/3/21]

33. Plaintiffs state Dr. McCaffrey testified that the only issues in the creation of NSFL were E.D.'s attempts to obtain clarity on NSFL's flyers and alleged involvement in the creation process by Mrs. Duell. Plaintiff's characterization of the testimony is inaccurate and based on an incomplete citation to the undisputed evidence. The cited testimony was in response to the question, "Did she break any rules -- E. or NSFL, break any rules with regards to the flyer that we spoke about earlier?" Plaintiffs' statement of fact ignores that, when asked why the club's approval was temporarily removed, Dr. McCaffrey testified, "Because there was an attempt at insubordination that was led by an outside adult advocating with the student." [Ex. 569 - McCaffrey Dep. I at 91:5-9] When asked what else led to his decision, Dr. McCaffrey stated, "Just flashbacks to 2019 and the accusation that we received in the, I think, the legal group was Freedom from Religion Foundation, letter from them about inappropriate adult activities; so that popped

right into my head." [Ex. 569 - McCaffrey Dep. I, 106:22-107:3] Dr. McCaffrey's email revoking the club also contained his reasoning. [Ex. 5 - McCaffrey Revocation Email]

34.     Plaintiffs state E.D. created the draft flyer for NSFL's call-out meeting. The testimony cited does not support that statement. The testimony cited relates to the flyer Plaintiff handed out at the activities fair; not the call out meeting flyer. [Ex. 567 - E.D. Dep. I, 25:17-26:10] The flyers Plaintiff proposed to Mrs. Mobley for the call-out meeting were templates from the national Students for Life of America. [Ex. 14 - Emails re: "Flyers for my group"]

35.     Plaintiffs assert Dr. McCaffrey wrote an article in the Noblesville Times publicly accusing NSFL of disregarding school protocols and implying E.D. violated "state laws and school policies." That statement is not supported by the evidence. Dr. McCaffrey's article contains no reference to E.D. and no allegations she violated state law. [Ex. 9 – McCaffrey Rebuttal Article]

36.     Plaintiffs claim after the December 3, 2021 article Defendants began bullying and harassing the Plaintiffs. None of the cited testimony supports Plaintiffs' statement. Defendants Statement of Undisputed Material Facts contains the specifics of the social media posts that Plaintiff characterize as "bullying" and "harassing." Those posts were made prior to December 3, 2021, and none of the Defendants' posts mentioned E.D. or NSFL. See *supra*, p. 14-15.

45.     Plaintiffs cite Dr. McCaffrey's testimony for the statement that club revocation was not typically the consequence for a first violation of rules governing student club flyers. The statement is not supported by the cited evidence. Dr. McCaffrey's actual testimony was that the consequences of a student group hanging flyers that were noncompliant would depend on if there was insubordination or "anything else major," and disapproval or cancellation of the student group "would be situational depending on what happened." [Ex. 569 - McCaffrey Dep. I, 35:15-25]

48.	Plaintiffs refer to a Black Student Union flyer containing a clip art image of a raised fist and claim this image is "undoubtedly political in nature" and tied to Black Lives Matter. The article cited by Plaintiffs for this proposition calls the raised fist "a global symbol of fighting oppression," not a symbol of any specific political party or movement.[8] There is no evidence that the raised fist image on the BSU posters was an advertisement or message for Black Lives Matter. Ms. Mobley testified she did *not* view the raised fist as political speech and that it would take a logical jump to connect the clip art to Black Lives Matter. [Ex. 571 - Mobley Dep. I at 47:1-23]

## II.	ARGUMENT

### A.	Plaintiffs fail to recognize that their constitutional and EAA claims brought under § 1983 must be analyzed under *Monell*.

Despite the Court's note in its Order on Defendants' motion to dismiss that Plaintiffs' §1983 claims (other than their individual capacity claims and state claim) are governed by *Monell* and its progeny, Plaintiffs do not take the critical first step of analyzing their claims under *Monell*. In fact, nowhere in Plaintiffs' 44-page brief is *Monell* even mentioned. *Monell* requires Plaintiffs to identify a written policy, widespread custom, or act of a final policymaker to proceed with any of their §1983 claims against Noblesville Schools. Plaintiffs have presented no evidence of any written policy, widespread custom, or act of a person with final policymaking authority that is alleged to have caused Plaintiffs' injuries. As such, Plaintiffs fail to present any evidence to support their *Monell*-based claims Counts I, II, III, IV, V, and VII of their Amended Complaint. This failure

---

[8] The National Geographic article cited by Plaintiffs was not viewable in full, as it requires a subscription.

is fatal to Plaintiffs' motion. Their motion for summary judgment as to Counts I, II, III, IV, V, and VII must be denied as there is no designated evidence to support those claims.

Plaintiffs attempt to support their *Monell* claims by arguing that the *lack* of any written policies gave NHS administrators unbridled discretion to make discriminatory decisions about student clubs based on the content of their flyers. As addressed above, a lack of policy is not automatically a basis for *Monell* liability. In *Jones v. City of Chicago*, the Seventh Circuit quoted the following with approval from the lower court's opinion, which granted summary judgment to the municipal defendant:

> No municipality may be held liable for its indifference to the mere possibility of a constitutional deprivation. Rather the plaintiff must show the municipality was aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures.

*Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986). "The isolated act of an employee generally is not sufficient to impose municipal liability." *Id.* at 204.

Although Plaintiffs make numerous conclusory statements accusing Noblesville Schools of discriminating based on political viewpoint and even creating a "caste system" within student-led clubs, Plaintiffs present no admissible evidence to support these claims. Plaintiffs have not shown that the revocation of NSFL was anything more than the isolated act of one employee exercising discretion in maintaining order in the school. The lack of express policies regarding the approval and revocation of student clubs does not support a finding of municipal culpability in these circumstances.

### B. Noblesville Schools' practices related to student clubs do not violate the First Amendment for granting unbridled discretion to administrators.

Even if Plaintiffs had pointed to a Noblesville Schools written policy, widespread custom, or person with final policymaking authority who caused NSFL's revocation, the evidence and applicable law do not support a finding for the Plaintiffs based on the doctrine of unbridled discretion. First, unbridled discretion is a concept typically applied in the context of prior restraints on speech, such as permitting and licensing schemes. Second, First Amendment law does not require Noblesville Schools to craft detailed policies limiting administrators' discretion to approve, deny, or revoke student clubs. The concept of unbridled discretion primarily applies in public forums, and although the Seventh Circuit has suggested the standard against unbridled discretion might apply in non-public forums, "this does not mean . . . that the same requirements apply in every instance in which the government restricts access to its property." *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co*., 716 F. Supp. 2d 773, 798 (W.D. Wis. 2010), *aff'd on other grounds*, 658 F.3d 614 (7th Cir. 2011) (citing *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools,* 457 F.3d 376, 386 (4th Cir.2006)). The "key question" where the forum is not public is "whether there is an appreciable risk that the lack of more specific standards will lead to the censorship of a particular viewpoint." *Id.* "When 'there is no serious concern about either notice or chilling effects,' more specific standards are not required." *Id.* (quoting *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 94 (1st Cir. 2004)).

As established above—and noted even in Plaintiffs' own brief [Doc. 153 at 31]— Noblesville Schools is not a public forum. Thus, the Court need not apply the unbridled discretion doctrine "mechanically . . . without inquiry into the characteristics of the relevant forum." *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1323 (Fed. Cir. 2002). Of course, the doctrine of unbridled discretion does not stand alone—it is a component of First Amendment viewpoint discrimination analysis. The purpose of the doctrine is to ensure government officials cannot

encourage some views and discourage others through arbitrary application of laws and policies. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2403, 120 L. Ed. 2d 101 (1992). Plaintiffs have offered no evidence of viewpoint censorship at Noblesville Schools. Rather, the undisputed evidence shows that Noblesville Schools has permitted pro-life, conservative, and religious student organizations to form and carry on club activities without issue. There is no evidence that the revocation of NSFL was in any way related to the club's viewpoint or that Noblesville Schools has ever taken a viewpoint-based approach regarding student clubs.

### C. Plaintiffs have produced no evidence of a causal connection between NSFL's pro-life viewpoint and Dr. McCaffrey's decision to temporarily revoke NSFL's approval.

With regard to the causation element of the First Amendment claims, Plaintiffs assert merely that the timing of E.D.'s presentation of pro-life flyers and Dr. McCaffrey's subsequent decision to revoke NSFL status is evidence of retaliatory animus.[9] The timing between E.D.'s presentation of the flyers and the club's revocation is due to the fact that Plaintiffs re-introduced the flyer to Mr. Luna after Ms. Mobley had already denied the flyer and provided E.D. with instructions on how to make an appropriate flyer, in addition to Mrs. Duell's presence at the meeting with Mr. Luna. The Court is "not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, . . . only reasonable ones." *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir.1986). The inference Plaintiffs would have the Court make is that Dr. McCaffrey saw the pro-life signs E.D. presented to Mr. Luna and, out of animus toward that

---

[9] Despite presenting their motion as pertaining to all counts of the Amended Complaint, Plaintiffs make no argument regarding their First Amendment retaliation claims against any Defendant other than Dr. McCaffrey. Plaintiffs have named seven teachers and staff as defendants to this lawsuit based solely on a First Amendment retaliation claim for comments and likes on social media. Plaintiffs have not dismissed those claims. Rather, they included them in their Statement of Claims filed on March 27, 2023. [Doc. 140] Now, they ignore those claims and yet ask for judgment in their favor on all claims brought against all Defendants.

viewpoint, decided to revoke the club, but only for the remainder of the semester. This inference is not reasonable given the evidence that Dr. McCaffrey approved NSFL with full knowledge of its viewpoint, is himself pro-life, and has remained consistent in his explanation for why he decided to temporarily revoke the club's approval.

### D. Noblesville Schools' policies and procedures were not "void for vagueness" in violation of the Fourteenth Amendment's due process clause.

As addressed above, Plaintiffs' due process claim cannot proceed, because the evidence does not give rise to a *Monell* claim. Even if the Court disagrees, however, Plaintiffs still cannot succeed on their due process claim, because they received all the process that was due. A policy or procedure might be void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment, if it "does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011) (citing *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). This standard is relaxed in the school setting. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686, 106 S. Ct. 3159, 3166, 92 L. Ed. 2d 549 (1986) ("We have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.") (internal quotations omitted). In *Fraser*, the plaintiff-student argued that his two-day suspension for delivering a lewd speech to the student body violated due process, because he had no way of knowing that he could be disciplined for the speech. *Id.* The U.S. Supreme Court found this argument "wholly without merit." *Id.* According to the Court, a two-day suspension "does not rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution." *Id.*

Plaintiffs cannot reasonably assert students who receive a "no" from one administrator, and then go to a different administrator in hopes of receiving a "yes," are taking perfectly acceptable action barring notice that this behavior is not permitted and could subject the student to discipline. School administrators need flexibility to address concerns and unacceptable student behavior, and to do so in ways that take into account the specific concerns arising from such behavior. There is no evidence Dr. McCaffrey has abused his discretion in addressing concerns of parent-assisted insubordination by "pressing pause" on the club for less than one semester out of E.D.'s eight semesters at NHS. Schools cannot possibly predict every type of misconduct or concerning behavior that could arise in a school year, and the circumstances at issue in this case fall aptly within the Supreme Court's grant of latitude.

### E. NSFL was permitted to form and there was no violation of Plaintiffs' Fourteenth Amendment Equal Protection rights.

With regard to Plaintiffs' Equal Protection claim, Plaintiffs assert only that they were denied equal protection through not being permitted to start NSFL—a false claim Plaintiffs repeat several times in their brief. The evidence shows E.D. *was* permitted to start NSFL and provided the same guidance and access as all other student groups. The relevant issue is whether *temporary revocation* of NSFL constituted disparate treatment from similarly situated groups. The evidence shows the Defendants were never presented with a similar situation, so there is no way to determine whether the response to E.D.'s conduct and Mrs. Duell's involvement was proportionate to Defendants' response to other student groups. Of note, Plaintiffs make no argument that Defendants' conduct was related to membership in a class or based on a class-of-one theory to meet the basic elements of an Equal Protection claim. Plaintiffs incorrectly assert that "discriminatory intent is presumed" when governmental regulations infringe on fundamental

rights. This assertion is unsupported by applicable precedent. Plaintiffs also fail to make any argument under rational basis review and assert only that the Defendants lack a compelling state interest for treating NSFL differently than other clubs. For all of the above reasons, summary judgment for the Plaintiffs on their Equal Protection claim is not warranted.

### F. Plaintiffs present no evidence of content-based discrimination to support their Equal Access Act claim.

The lack of evidence of any viewpoint discrimination by Dr. McCaffrey regarding his decision to temporarily revoke NSFL also means Plaintiffs cannot maintain an Equal Access Act claim against Dr. McCaffrey. As addressed above, there is no evidence that Dr. McCaffrey was concerned about the content of NSFL's speech. Additionally, the evidence shows Dr. McCaffrey's decision was in furtherance of "maintain[ing] order and discipline on school premises"—conduct which the Equal Access Act expressly reserved as insulated from the Act's mandate that student groups be allowed equal access to facilities. 20 U.S.C. § 4071(f).

Plaintiffs also argue that it was a violation of the Equal Access Act for NHS to deny NSFL the privilege of advertising political speech in school hallways when it permitted other clubs to do so. Plaintiffs' Amended Complaint asserts an Equal Access Claim solely based on the temporary revocation of NSFL. Moreover, the only Equal Access Act claim asserted in Plaintiff's Statement of Claims is based on Noblesville Schools' alleged refusal to allow Plaintiffs "to conduct meetings due to the content of their speech." [Doc. 140] Plaintiffs cannot assert a new theory of liability under the Equal Access Act for the first time in at the summary judgment stage.

Even if Plaintiff were permitted to present a new Equal Access Act claim, the admissible evidence in the record shows that Noblesville Schools did not permit other clubs to hang flyers with political speech. Rather, the evidence shows Noblesville Schools had a practice of denying

political speech on club flyers. As addressed *supra*, the Black Student Union flyer identified by Plaintiffs did not contain political speech and, in any case, was not approved by any administrators. There is no basis to infer the Defendants refused to permit Plaintiffs to hang a flyer stating "Defund Planned Parenthood" out of disagreement with that speech. To the contrary, Ms. Mobley—the administrator who initially denied Plaintiffs' flyers—testified that she takes a pro-life stance and was "really grateful" when E.D. started a pro-life club at NHS. [Ex. 571 - Mobley Dep. I, 42:25-43:1]

### G. Even if Plaintiffs were entitled to summary judgment as to liability, the issue of damages should not be determined on summary judgment.

First, Plaintiffs have asserted only that economic damages are owed because of Dr. McCaffrey's article in the Noblesville Times in which he responded to public allegations of discrimination against NSFL. [Ex. 9 – McCaffrey Rebuttal Article; Ex. 51 – Micah Beckwith's article in Noblesville Times 12/3/21] Plaintiffs make no coherent argument that this article independently constitutes a violation of Plaintiffs' rights under any claim remaining in this case. Plaintiffs' references to this article appear to be an attempt to revive their state-law defamation claim, and the article does not bear on any element of Plaintiffs' remaining claims. Plaintiffs are not entitled to damages allegedly caused by this article.[10]

In any case, the Opinion of Economic Loss prepared by Plaintiffs' self-described expert witness has not been designated in support of Plaintiffs' Motion for Summary Judgment, and Plaintiffs have not designated any facts in support of their demand for $1,142,489.00. *See* Fed. R. Civ. Pro. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support

---

[10] Plaintiffs also cite to an Affidavit of E.D. in support of their claim for $100 in expenses, but Plaintiffs' designation of evidence does not contain any affidavit.

the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials."); S.D. Ind. L.R. 56-1(e) ("A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."). Defendants expressly do not waive any argument related to the reliability of the referenced Opinion of Economic Loss, but rather heavily dispute that the Opinion would be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which requires that a court determine "(1) whether the expert will testify to valid scientific or other expert knowledge based on sound methodology and (2) whether the testimony will assist the trier of fact with a fact at issue." *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir. 2001). Under *Daubert* as well as Rule 702 of the Federal Rules of Evidence*,* "a district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir. 2001). Even if the Opinion were properly before the Court, Plaintiffs have not provided any information to establish that Opinion is anything but speculative. Plaintiffs are not entitled to summary judgment on the damages claim award with no evidence offered in support of the damages issue.

## III.      CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment as a matter of law on each of Plaintiffs' claims against them. Accordingly, Defendants respectfully request that summary judgment be entered in their favor with respect to all of Plaintiffs' claims. Because such a ruling disposes of all remaining claims against all parties, Defendants also request the Court to enter final judgment in their favor.

Respectfully submitted,


*Liberty L. Roberts*
Liberty L. Roberts, Atty. No. 23107-49
Cassie N. Heeke, Atty. No. 36497-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060

*Attorneys for Defendants*

| Exhibit | Description |
|---|---|
| 1 | Club Proposal Questions |
| 2 | E.D.'s Answers to Club Proposal Questions |
| 5 | McCaffrey Email suspending club status, 9/3/21 |
| 9 | McCaffrey Rebuttal Article |
| 14 | Emails RE "Flyers for my group" 8/31/21-9/2/21 |
| 21 | Facebook comment by Emily Patterson-Jackson liked by Alison Rootes & Beth Kizer |
| 24 | Facebook "like" by Allison Schwingendorf-Haley |
| 26 | Facebook comment "liked" by Alexandra Snider Pasko |
| 28 | Facebook comment liked by Grace Tuesca |
| 29 | Instagram comment liked by Grace Tuesca |
| 30 | Instagram comment liked by Grace Tuesca |
| 31 | Facebook Comment liked by Grace Tuesca |
| 32 | Facebook posts liked by Grace Tuesca |
| 34 | NHS Student Handbook 2021-2022 |
| 37 | Facebook comment by Stephanie Eads |
| 45 | Facebook Comment by Emily Patterson Jackson |
| 51 | Micah Beckwith's article in Noblesville Times 12/3/21 |
| 511 | First Thread of Comments on Mahoney's Facebook Post |
| 512 | Second Thread of Comments on Mahoney's Facebook Post |
| 554 | Recording of Meeting on 8/3/2021 with McCaffrey |
| 558 | NSFL Instagram Post |
| 564 | Except from E.D.'s journal |
| 565 | Email between E.D. and Mary Carmen, 9/4/21 |
| 566 | E.D.'s Responses to Request for Production of Documents No. 18 |
| 567 | Deposition of E.D. Part I |
| 568 | Deposition of E.D. Part II |
| 569 | Deposition of Craig McCaffrey, Part I |
| 570 | Deposition of Craig McCaffrey, Part II |
| 571 | Deposition of Janae Mobley, Part I |
| 573 | Deposition of Jeremy Luna, Part I |
| 575 | Deposition of Beth Niedermeyer |
| 576 | Affidavit of Craig McCaffrey |
| 577 | Deposition of Pasko |
| 578 | Deposition of Swafford |
| 579 | Deposition of Lisa Duell |
| 580 | Deposition of Grace Tuesca |
| 581 | Email RE: Club List for Fall 2021 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August 2023, a true and exact copy of the

foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing

was sent to the following persons by operation of the Court's Electronic filing system.

Zachary S. Kester
zkester@charitableallies.org
L. Katie Buckner
kbuckner@charitableallies.org
Spencer E. Rehn
srehn@charitableallies.org
CHARTABLE ALLIES, INC.
9100 Purdue Road, Suite 115
Indianapolis, IN 46268
*Attorneys for Plaintiffs*

*Liberty L. Roberts*
Liberty L. Roberts

Two North Ninth Street
Noblesville, IN 46060
T:  (317)773-2190 / F:  (317)773-5320
Email:  LRoberts@cchalaw.com