*Duell, et al.*

*v.*

*Noblesville School District, et al.*

---

**Daniel J. Swafford**

February 06, 2023

*Duell, et al. v. Noblesville School District, et al.*

---



SMITH REPORTING
INDIANA COURT REPORTERS
400 North High Street, Suite 200, Muncie, Indiana 47305
800.700.3566  -  765.284.7836
www.smithreporting.net

Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

18

1  Q.  So was there a number limit to how many fliers
2      a student could print out?
3  A.  No.  No.
4  Q.  Okay.
5  A.  It was mainly by location.  We wanted to try
6      to keep postings in the area that would create
7      the most impact, that would get the most --
8      kids would see it.  Putting things on lockers
9      doesn't work.
10 Q.  What other locations did you see students try
11     to use that you wouldn't allow or that
12     wouldn't work?
13 A.  Did allow or did not?
14 Q.  Did not allow.
15 A.  Did not, okay.
16 Q.  So did you allow things on lockers?
17 A.  No.
18 Q.  Okay.  What else?
19 A.  On outside of teachers' doors, in the
20     hallways, stairways, exteriors, exterior areas
21     of the building.
22 Q.  Any other locations that were not allowed?
23 A.  No.
24 Q.  So where could a student find out where they
25     were allowed to post their posters?

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

19

```
 1  A.   Generally it was through their club sponsor
 2       and then -- then they would tell them where
 3       they could post those things.
 4  Q.   Okay.  So, like, a faculty sponsor would
 5       communicate verbally to the students?
 6  A.   Yes.
 7  Q.   How did the faculty sponsor know the rules
 8       about where to post fliers?
 9  A.   We had always told them.
10  Q.   In staff meetings or through e-mails, or how
11       would that get communicated?
12  A.   Staff meetings, e-mail, questions from
13       sponsors.
14  Q.   So when you took over as facilities manager,
15       as part of your role, did you implement new
16       rules that didn't exist before regarding
17       posting on the walls?
18  A.   No.
19  Q.   Okay.  So we mentioned there were limitations
20       on where they could be posted, limitations on
21       how many they could print out and hang.  Any
22       other limitations?
23  A.   How.
24  Q.   How, what do you mean?
25  A.   We wanted them to -- this sounds silly.  We
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 4 of 14 PageID #: 2769

Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

20

```
 1            wanted them to use blue tape or painter's
 2            tape.
 3   Q.       Okay.
 4   A.       Because using packing tape or duct tape soaks
 5            into the brick, or if it's put on some painted
 6            surfaces, it actually pulls -- or Scotch tape,
 7            it actually pulls the paint off when they take
 8            them down, and it damages the walls.
 9   Q.       So if a student wanted to hang something on
10            the wall, their only method to do it
11            permissibly was with blue painter's tape?
12   A.       Or painter's tape, yes.
13   Q.       Okay.  Any other rules regarding putting
14            things on the wall?
15   A.       I can't think of any.
16   Q.       So the rules we just talked about regarding
17            number of fliers, location, the tape, those
18            were all in place when you started in about
19            2015 as a facilities manager?
20   A.       Uh-huh.
21   Q.       Has that shifted over time?  Have the rules
22            changed in the past handful of years?
23   A.       I would say the only thing that has changed is
24            within the last year, we have gone to -- we
25            have moved to an electronic means to get that
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 5 of 14 PageID #: 2770

Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

21

```
 1         information out as opposed to posting.  It's
 2         taken time, but, for example, in the cafeteria
 3         there are nine large monitors.  In the front
 4         of the counseling office, there's one.
 5         There's also monitors as you walk into the bus
 6         entrances on the north end of the building
 7         that we now use to put that information out.
 8         They're connected.  The messaging goes out to
 9         those.
10   Q.    Okay.  So a student can advertise for their
11         club now by posting to this monitor?
12   A.    They cannot.  Their sponsor can submit it --
13   Q.    Okay.
14   A.    -- to one of our secretaries who monitors, who
15         monitors that, and she has the control of what
16         information goes out, when, what time it runs.
17   Q.    The secretary?
18   A.    Uh-huh.
19   Q.    What's her name?
20   A.    Jessica Emmerson.
21   Q.    Is Ms. Emmerson the one who monitors those
22         monitors or is there someone else who assists
23         in that?
24   A.    She -- I think she is the only one.
25   Q.    Does Ms. Emmerson decide which things are
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 6 of 14 PageID #: 2771

Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

30

```
 1        system?
 2   A.   Switching over.
 3   Q.   Okay.  When did the switch to the monitors
 4        happen?
 5   A.   Relatively early on in the school year.  I
 6        don't have a specific date.
 7   Q.   Which semester?
 8   A.   I -- I don't know.
 9   Q.   You can't remember whether it was the fall of
10        '21 or the spring of '22?
11   A.   I can't.
12   Q.   Okay.
13   A.   It was a process.  They were coming in at
14        various times and getting installed because
15        they were supposed to be installed during the
16        pandemic and didn't.
17   Q.   Oh, the monitors weren't.  Got you.  So it was
18        kind of a process even just as they were
19        installing the monitors?
20   A.   Correct.
21   Q.   Do you recall when was the final monitor
22        installed?
23   A.   In which area?
24   Q.   In the school.
25   A.   The ones in athletics, the last one was about
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 7 of 14 PageID #: 2772

Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

31

1        three weeks ago.
2   Q.   Okay.  So going back to the time before the
3        monitors, so when students were posting on the
4        walls, what was the process for them to get a
5        flier or a poster approved?
6   A.   They were to contact through the sponsor to
7        get approval to put a flier up.  Then they
8        were supposed to put a date on them as to when
9        they were supposed to come down and the
10       initials of whoever approved it.
11  Q.   Do people generally follow those guidelines,
12       putting the date on it and the initials?
13  A.   What do you mean by generally?
14  Q.   So as I walk down the halls in Noblesville
15       High School, would every flier have the date
16       and the initials --
17  A.   No.
18  Q.   -- or half of them, or how many would you
19       estimate?
20  A.   I don't know if I could estimate.  That would
21       be -- not all.
22  Q.   But not all of them?
23  A.   No.
24  Q.   What would you do if you saw a flier that
25       didn't have that, like, approval?

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 8 of 14 PageID #: 2773
Daniel J. Swafford -  - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

32

```
 1  A.   I'd follow up with that.  If it was me, not
 2       one of the other assistants, but if it was me,
 3       then I would follow up with that sponsor or
 4       take them down and have them put them back up
 5       if it happened to be posted at a place that
 6       they weren't supposed to be.
 7  Q.   When you would go touch base with a sponsor,
 8       what would you discuss?  What kind of concerns
 9       did you have?
10  A.   That it's supposed to have the date on it and
11       to find out who approved, who said it was okay
12       to put it up and have that conversation.
13  Q.   Have you had many of those conversations?
14  A.   Not a lot.
15  Q.   The ones that you have had, how would the
16       teacher sponsors generally respond?
17  A.   They were compliant I guess.  That would be
18       one way to put it.  It's not contentious.
19  Q.   Okay.  So do they generally follow your
20       recommendation?
21  A.   Yes.
22  Q.   Get the approval?
23  A.   Yes.
24  Q.   And then put them back on the wall?
25  A.   Yes.
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 9 of 14 PageID #: 2774

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

33

1  Q.   Did you find that there was someone else in
2       the building approving fliers?
3  A.   That did happen from time to time.  The other
4       assistants would from time to time.
5  Q.   Okay.  If that happened, if you learned that
6       this particular flier was approved by another
7       assistant principal, what would you do?
8  A.   If it -- you mean if it was not posted in the
9       right place or --
10 Q.   Let's say it was in a place that it's allowed
11      to be, but there wasn't the signature and the
12      date, as you mentioned it should have.
13 A.   Then the sponsor would put the initials back
14      up on there so we would know that it was okay
15      for it to be up.
16 Q.   Okay.  So you mentioned the students and
17      student club should work with their sponsor to
18      get the approval to put it up; is that right?
19 A.   The sponsor would, yes.
20 Q.   Okay.  So what does that process look like to
21      get the approval?
22 A.   Just in an e-mail.
23 Q.   Who would e-mail who?
24 A.   Generally the sponsor.
25 Q.   So the sponsor would have that draft flier and

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 10 of 14 PageID #: 2775

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

34

```
 1         send it to who?  To you?
 2  A.     Yes.  Or sometimes another assistant.
 3  Q.     But an assistant principal?
 4  A.     Yes.
 5  Q.     Did all of the assistant principals have
 6         authority to approve these fliers?
 7  A.     Yes.
 8  Q.     Okay.  Were students permitted to e-mail the
 9         assistant principal to get fliers approved?
10  A.     They could.  They weren't supposed to.  We
11         would then follow up with the sponsor.
12  Q.     Okay.  Did you see that happen where a student
13         would --
14  A.     It did happen.  It would happen periodically.
15  Q.     So then what would you do?
16  A.     Have the sponsor e-mail back, and we'll work
17         through that.
18  Q.     Okay.  What are the criteria for the content
19         of a valid student club flier?
20  A.     That was communicated -- for example, if it
21         was supposed to be a call-out meeting, then it
22         would have when it was, where it was supposed
23         to be, that it had -- it wasn't just a general
24         poster or it was just a flier about this club
25         or that organization.  If it was a club
```

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 11 of 14
PageID #: 2776

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

35

1           call-out, it would say in the junior-senior
2           cafeteria on this date and what it's for.
3    Q.     Anything else?
4    A.     That it was appropriate to be in school.
5    Q.     Anything else?
6    A.     No.
7    Q.     What kinds of things would not be school
8           appropriate for that flier or a poster?
9    A.     In a general sense, things that would be
10          disruptive to the school environment.
11   Q.     Anything else?
12   A.     No.
13   Q.     Have you seen any proposed fliers or posters
14          that were not permitted because they were
15          deemed inappropriate?
16   A.     The one I can think of recently was -- I don't
17          know if it would fall under the category of
18          inappropriate, but a Boy Scout came to me
19          wanting put up some fliers that related to his
20          Eagle Scout project.
21   Q.     Okay.
22   A.     I did not allow that because it did not
23          connect directly to anything associated with
24          the school.  While admirable and commendable,
25          it just didn't have a place in the school.

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

36

1  Q.   Are there any other examples of fliers you
2       recall not being permitted to be posted?
3  A.   One, it was a student entrepreneur in one of
4       our classes that wanted to advertise for his
5       business that he was starting.  We did not
6       allow it because it did not connect to the
7       class.  It was just his own business that he
8       wanted to advertise.
9  Q.   Okay.  Anything else?
10 A.   No.
11 Q.   Do you remember any other fliers that were not
12      approved?
13 A.   Not specifically.
14 Q.   Are student fliers or posters permitted to
15      have a photo on them?
16 A.   I don't know.
17 Q.   Did you approve any fliers that did have
18      photos?
19 A.   That did, no.  I don't recall, have any
20      recollection of that.
21 Q.   Okay.  How about, like, a drawing or some sort
22      of art on the posters?  Is that allowed?
23 A.   They have had art, yes.
24 Q.   How about a graphic or clip art?
25 A.   Is that the same as art?

Case 1:21-cv-03075-SEB-TAB   Document 158-27   Filed 08/01/23   Page 13 of 14 PageID #: 2778

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

37

1  Q.   Maybe there's some overlap there.  But --
2  A.   Okay.
3  Q.   -- would you permit that sort of thing, like a
4       graphic clip art?
5  A.   It could.
6  Q.   But you wouldn't necessarily allow a photo or
7       you just haven't seen photos on these posters?
8  A.   A photo I can't recall.
9  Q.   Okay.  So when the school was still doing the
10      physical posters, where were they allowed to
11      be posted?
12 A.   There's an area in the upstairs in the
13      freshman center that's in a, like -- it's,
14      like, in a main hallway.  There's a lot of
15      traffic there.  Near the bus entrances, the
16      cafeteria, and near the auditorium, which is
17      an area where there's a lot of student traffic
18      before school, after school.
19 Q.   Anywhere else?
20 A.   No.
21 Q.   Could student groups post fliers in
22      classrooms?
23 A.   On teachers' bulletin boards they could, but
24      if that's -- again, it wasn't an area that was
25      in the teachers' classrooms.

Daniel J. Swafford - - February 6, 2023
Duell, et al. v. Noblesville School District, et al.

38

```
 1  Q.    Could students put fliers on lockers?
 2  A.    No.
 3  Q.    Is a student allowed to decorate their own
 4        locker?
 5  A.    No.
 6  Q.    Have students ever been allowed to decorate
 7        their lockers while you've been assistant
 8        principal?
 9  A.    Yes.  Limited circumstances before.  For
10        example, state performances, state
11        tournaments, very short-term school play.
12  Q.    So maybe for a day or two --
13  A.    Correct.
14  Q.    -- the week of the event?
15  A.    Correct.
16  Q.    Was it your role to monitor that rule
17        regarding decorating a locker or did someone
18        else make sure their lockers were only
19        decorated when they were allowed to be?
20  A.    No.  That generally would come through me, but
21        any assistant principal.  For example, if it
22        was athletic, people in athletics know what
23        the guideline is, so if somebody's going to
24        the state tournament, you know, state final
25        game, that they're allowed to decorate.
```