UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

E. D., et al.,                                    )
                                                 )
            Plaintiffs,                          )
                                                 )
            v.                                   )      No. 1:21-cv-03075-SEB-TAB
                                                 )
NOBLESVILLE SCHOOL DISTRICT, et al.,             )
                                                 )
            Defendants.                          )

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This litigation arises out of events surrounding the temporary revocation of

approval by school officials for the formation of a pro-life club at Noblesville High

School and the ensuing public discussion of those events on social media and in the press.

Plaintiffs E.D., a minor, by and through her parents and next friends Michael and Lisa

Duell, and Noblesville Students for Life, a student club formed by E.D., have jointly

brought this action against Defendants Noblesville School District, Noblesville High

School, and various school employees and administrators, originally alleging nineteen

separate counts against Defendants under federal and state law.

Following the Court's ruling on Defendants' motion to dismiss and Plaintiffs'

motion to reconsider parts of that ruling, the following claims remain to be decided:

Count I (First Amendment Right of Association); Count II (First Amendment Freedom of

Speech); Count III (Fourteenth Amendment Due Process); Count IV (Fourteenth

Amendment Equal Protection); Counts V and VI (First Amendment Retaliation; Count

VII (Equal Access Act); Count VIII (Violation of School Policies Against Bullying);

1

Count IX (Libel, Slander, and Defamation); Count XI (Intimidation and Bullying); Count XIII (Intentional Infliction of Emotional Distress); Count XV (Privacy by Publication of Private Facts); and Count XIX (Indiana Constitution).  These twelve claims are now before us on cross-motions for summary judgment filed by Plaintiffs [Dkt. 152] and Defendants [Dkt. 157], respectively.

For the reasons detailed below, we DENY Plaintiff's Motion for Summary Judgment and GRANT Defendant's Cross Motion for Summary Judgment.

## **Factual Background[1]**

**The Parties**

Plaintiff E.D. is a student who attends Noblesville High School ("NHS"), located in Noblesville, Indiana.  In August 2021, when E.D. was a freshman at NHS, she formed a student organization, Plaintiff Noblesville Students for Life ("NSFL").

Defendant NHS is a part of the Defendant Noblesville School District, a public, state-funded school system.  Also named as Defendants in this litigation are several individual employees of Noblesville School District.  During the time period relevant to this litigation, the individually named Defendants occupied the following positions: Dr. Beth Niedermeyer was Noblesville Schools Superintendent; Dr. Craig McCaffrey was the NHS Principal; Janae Mobley and Daniel Swafford were NHS Assistant Principals; Jeremy Luna was Dean of Students at NHS; Alison Rootes was a technical assistant who

---

[1] Plaintiffs include facts in their briefing regarding current school policies, arguing that those policies create an unconstitutional "caste system" among different categories of student groups. However, no such allegations or claims were included in Plaintiffs' amended complaint and thus are not part of this lawsuit.  Accordingly, we have not addressed those policies in this entry.

worked primarily at North Elementary and Stony Creek Elementary Schools; Elizabeth Kizer was a special education teacher and transition coordinator at NHS; Emily Patterson-Jackson was an instructional assistant in special education classes at Noblesville West Middle School; Grace Tuesca was an after-school and before-school teacher for grades two through five with Miller Explorers; Allison Schwingendorf-Haley was an English teacher at NHS; and Stephanie Eads was a second grade teacher at Stony Creek Elementary.  Defendant Alexandra Snider Pasko was an attendance and in-school suspension assistant at Noblesville East Middle School at the beginning of the fall 2021 semester but resigned from her employment prior to the date on which she engaged in the conduct for which she is being sued by Plaintiffs.

**NHS Student Interest Clubs**

There are several types of student groups at NHS, including school clubs, academic teams, extra-curricular activities, co-curricular activities, and student interest clubs.  McCaffrey Dep. II at 49.  With the exception of student interest clubs, these groups are school sponsored and led by a school-approved adult who is actively involved in organizing and running the group.

Student interest clubs, by contrast, are created by students who want to gather with other students who hold similar interest in a particular subject.  These groups are student-driven and student-led.  A faculty sponsor is present to supervise the students during their use of school facilities, to remain available to answer questions, and to assist with logistics, but the adult does not actively participate in the club.  In the fall of 2021, several active student interest clubs were active at NHS, including, but not limited to, the

Conservation Club, Campus Crusade for Christ, Fellowship of Christian Athletes, Gender and Sexuality Alliance, Key Club, Leo Club, Noblesville Young Democrats, Young Republicans, and Police Explorers.  Dkt. 158-30.

During the 2021–2022 school year, Noblesville Schools had not promulgated written rules or policies governing the procedures for starting a new student interest club. McCaffrey Dep. II at 24–25.  When students came up with club proposals, they were directed to find a faculty sponsor and fill out a brief questionnaire.  McCaffrey Dep. I at 21, 23.  Once a faculty member agreed to serve as a club sponsor, that faculty member was available to answer the student leader's questions as well as assist with meeting supervision and logistics.  *Id.* at 37–38.  Dr. McCaffrey, as principal, was responsible for reviewing all the proposals and questionnaires and for approving the formation of student interest clubs.

**Policies Regarding Student Flyers**

The 2021–2022 Noblesville High School Student Handbook set forth rules applicable to the posting of flyers at the school, which requirements provided as follows:

> Any materials posted at [NHS] must be posted only in the cafeteria and/or commons areas, and they should be removed after the date of the event. Posters must promote a school-sponsored event or have administrative approval to be posted.

> If materials promote a non-school event, they must list the sponsoring group. The sponsoring group must be local, must be clearly named on the posters, and must be a non-for-profit organization.  The event itself must be educational in nature.

Dkt. 158-13.

Other than these provisions, there was no written policy in place the fall of 2021 governing the content of student interest club advertising flyers, including whether they could contain graphics, photographs, or logos.  Nor were there written policies or procedures for receiving school approval to post such flyers.  According to Defendants, despite there being no official written policy, school administrators and club sponsors knew that flyers for all club call-out meetings were to include the name of the club and the date, time, and location of the meeting, and anything disruptive to the school environment was prohibited.  *Id.* at 34–35; Mobley Dep. I at 15–19.

During the time period relevant to this litigation, NHS students were not permitted to display posters on school walls without prior approval from an administrator.  Approved posters were required to include a written take-down date and the initials of the administrator who had approved the poster and be affixed to the wall surfaces only with blue tape.  Mobley Dep. I at 14; Swafford Dep. at 19–20, 31.  During the fall of 2021, NHS administrators limited the display of posters to the main hallway of the freshman center, near bus the entrances and the auditorium, and in the cafeteria.  Swafford Dep. at 37.

**Formation of Noblesville Students for Life**

During the summer of 2021, E.D. contacted school administrators at NHS seeking information regarding the formation of a student interest club, to wit, the Noblesville Students for Life ("NSFL").  She was informed that she would first need to find a faculty advisor for the club, which she accomplished on July 28, 2021.  On August 3, 2021, which was the second day of the 2021–2022 school year, E.D. met with Dr. McCaffrey to

discuss the next steps for securing school approval for establishing NSFL.  E.D. Dep. I at 10.  At E.D.'s request, her mother, Lisa Duell, also attended that meeting and in fact audio-recorded the conversation.  E.D. had asked her mother to attend because her family had a rule that she was not to be alone with any male adult and, in addition, E.D. wanted to have a recording of the meeting in case "Dr. McCaffrey decided [based on] discriminatory or other false reasons not to permit [her] club," thereby allowing her to "pursue the steps necessary to make sure [she] did get [her] club."  E.D. Dep. I at 13–14.  Neither E.D. nor Ms. Duell mentioned to Dr. McCaffrey that one of the reasons Ms. Duell was attending the meeting was because of their family no contact policy.

During the meeting, E.D. informed Dr. McCaffrey that she wanted to start NSFL and explained to him the club's pro-life mission.  Duell Dep. at 19; E.D. Dep. I at 13–23.  Through formation of the club, E.D. sought "to educate [her] peers on the issue of abortion and empower [her] peers to volunteer in the local community with pregnancy-related items."  E.D. Dep. I at 18.  Dr. McCaffrey provided E.D. with a club questionnaire form to complete and advised that its completion and submission was the only other step she needed to take before NSFL could be approved as a student interest club.  *Id.* at 16–17.  He specifically stated during that meeting that, because NSFL would be designated as a student interest club, it was important that the club be student-based.

Ms. Duell spoke at several points during the meeting, inquiring as to the date when the club fair was scheduled, the process of securing a speaker to address the club, whether NSFL could have a booth at NHS's activities fair and, if so, whether E.D. should prepare anything for the fair.  She also coached E.D. to clarify for Dr. McCaffrey the

involvement of Students for Life of America ("SFLA"),[2] specifically, regarding whether SFLA was requiring NSFL to adhere to a code of conduct and whether SFLA's contract addressed the organization's use of photographs of NHS and its students.  This discussion prompted Dr. McCaffrey's mention to Ms. Duell of a prior situation when student photos appeared on an organization's website.  E.D. Dep. II at 18–25, 92–93.

Following the August 3rd meeting, E.D. completed the questionnaire and returned it to Dr. McCaffrey.  In her responses, E.D. explained that she intended to establish NSFL "to raise awareness and generate discussion about the abortion issue while also doing something about it through volunteering."  Dkt. 158-1; Dkt. 158-2.  She wrote that the club would "empower students to knowledgably and courageously speak about abortion," "strive to bring awareness to the abortion issue," and "positively impact [her] peers' respect and value for life and the unborn."  *Id.*  Her plans for the club's activities included "flyering, tabling, chalking, volunteering at a local pregnancy resource center, participating on national pro-life days, and conducting drives for various needs [the] local pregnancy resource center may have."  *Id.*  E.D. referenced her plan for NSFL to invite guest speakers to present programs on pro-life topics.  *Id.*  She also indicated that she would recruit members through her church and social media as well as "flyering about activities the club has planned and tabling at the clubs fair."  *Id.*

After receiving E.D.'s completed club questionnaire, Dr. McCaffrey approved the creation of NSFL as a student interest club.  E.D. Dep. I at 21–22.  Once approved, NSFL

---

[2] SFLA is a national pro-life advocacy organization that, among other things, helps organize student groups at high schools and on college campuses.

was allowed to participate in the fall activities fair at NHS held on August 19, 2021.  E.D. staffed the NSFL booth at the fair wearing a message t-shirt that stated, "I am the pro-life generation."  The booth displayed a tri-fold poster that E.D. had created with NSFL's mission statement including a sign that read, "I am the pro-life generation."  E.D. Dep. II at 40–43.  NSFL advertised at the fair the activities in which the club planned to participate in the future, including a trip to Washington D.C. for the March for Life planned for January 2022.  E.D. Dep. I at 26.  More than thirty students signed up for NSFL during the activities fair.  *Id.* at 29–30, 65.

**Noblesville Students for Life Flyers**

Approximately two weeks following the fair, on August 27, 2021, E.D. met with Assistant Principal Mobley to schedule a callout meeting date for NSFL and to secure clarification of the rules applicable to advertising flyers.  *Id.* at 26.  On August 31, 2021, E.D. emailed Ms. Mobley digital copies of two flyers she planned to post in NHS to advertise NSFL's callout meeting.  Both flyers included photographs of students in front of the United States Supreme Court building in Washington D.C. carrying signs that read, "I Reject Abortion," "Defund Planned Parenthood," and "I Am the Pro-Life Generation," among other similar messages.  The proposed flyers also contained text stating: "Pro-Life Students, It's Time to Meet Up!" and included blank spaces at the bottom for E.D. to insert specific details regarding the meeting's time, place, topic, and sponsor.  Also, at the bottom of both flyers, was a very small logo depiction for SFLA.  Neither poster included the words "Noblesville Students for Life."  *See* Dkt. 158-5.

The next morning, on September 1, 2021, Ms. Mobley responded to E.D.'s email regarding NSFL's proposed flyers, as follows:

> We need flyers advertising that this is a "Noblesville Students for Life" Club meeting location, date, and time. We do not need the pictures of the signage. For example, our Young Republican's [sic] club does not display items for the Republican Party. Their flyers just simply state the club name and meeting/call-out information. Then obviously at the club meeting and call-out, you guys can discuss whatever is your topic at hand.
>
> In the future, I will probably have you run these by Mr. McCauley first to get appropriate revisions made. After his approval, we can get them to an administrator to approve prior to hanging in the halls.

*Id.* at 3–4.

After sending this response to E.D., Ms. Mobley emailed Mr. McCauley, NSFL's faculty advisor, asking him to work with E.D. to revise the flyers. *Id.* at 4. Less than an hour after receiving Ms. Mobley's email, Mr. McCauley emailed E.D. to give her instructions, as follows:

> The best thing to do for the flyers is to simply put this info on them:
>
> Noblesville Students for Life Club
> Meeting Date: ???
> Meeting Time: ???
> Meeting Location: ???
>
> Once you get the flyer finished, will you please email it to me so that I can approve it?

*Id.* at 4. In his communications with E.D., Mr. McCauley also instructed E.D. to email Mr. Luna to confirm the call-out date, time, and location. *Id.* at 5.

Later that same evening, E.D. responded to Mr. McCauley's email, stating that she had hoped to use the template flyers from the SFLA website for NSFL's poster and

simply add the call-out meeting details to the template.  *Id.*  She also noted that she had been trying to contact Mr. Luna but that he was not responding.  She offered to email Mr. Luna again, copying Mr. McCauley, but suggested that it might be better for Mr. McCauley to reach out to Mr. Luna directly.  *Id.*

The next morning, on September 2, 2021, at 9:29 a.m., Mr. McCauley responded to E.D.'s email by offering to contact Mr. Luna that day for approval of the call-out date and time.  He also reiterated his prior instructions regarding the content of the poster, as follows:

> I think it is best just to have this info only on the flyers: (no pictures, etc.)
>
> Noblesville Students for Life Club
>
> Meeting Date: ???
>
> Meeting [T]ime: ???
>
> Meeting [L]ocation: ???
>
> Send me a pic of the final flyer and we'll get it figured out.

*Id.*  At 10:14 a.m., E.D. responded again by email as follows: "Sounds good, thanks!  I'll get to work on making the flyers."  *Id.*

On September 3, 2021, before school began that morning, E.D. requested a meeting with Mr. Luna.  The meeting occurred later in the morning; Ms. Duell also attended so that E.D. would not be alone with a male adult per their family rule.  (The reason for Ms. Duell's presence was not communicated to Mr. Luna.)  At that meeting, E.D. requested a specific callout date for NSFL because she had not received a response

to her prior emails to Mr. Luna.  Mr. Luna responded that he might "do it over the weekend."  E.D. Dep. I at 43–44; Luna Dep. I at 33, 36–37.

E.D. showed Mr. Luna the posters she had previously sent to Ms. Mobley for approval.  E.D. has testified that Mr. Luna told her that the posters were inappropriate because they contained a picture and that the pictures were inappropriate because of their political nature.  E.D. Dep. I at 48–49.  According to E.D. and her mother, Mr. Luna also stated that he could not approve the posters because the school was already dancing or walking "on eggshells."  *Id.* at 49; Duell Dep. at 32.

Mr. Luna has testified that he told E.D. and her mother that the flyer could not include a political photo of a "picket" with multiple signs reading "Defund Planned Parenthood."  Luna Dep. I at 40–41.  When E.D. asked if she would be permitted to hang the flyers if she removed the "Defund Planned Parenthood" signs, Mr. Luna said that that "should" or "would possibly work," but that he was not the school administrator who approved student clubs and flyers, so he did not know what would be allowed.  Luna Dep. I at 18–19, 40–41, 42; E.D. Dep. I at 49–50.  This was not entirely consistent with what Dr. Mobley had told E.D. in informing her that any administrator could approve flyers.  E.D. Dep. I at 67; Mobley Dep. II at 40–41.

E.D. has testified that she left the meeting with Mr. Luna feeling disappointed and unsure regarding the next steps for receiving approval for NSFL's flyers and callout meeting date.  E.D. Dep. I at 51–52.

**Dr. McCaffrey Revokes NSFL's Club Status**

Immediately following his meeting with E.D. and her mother on the morning of September 3rd, Mr. Luna spoke with Dr. McCaffrey and Ms. Mobley about what had occurred. According to Mr. Luna, he felt that the meeting was a three-way conversation between E.D. Ms. Duell, and himself, with Ms. Duell driving the conversation. Luna Dep. I at 47. Both Dr. McCaffrey and Ms. Mobley expressed their concerns to Mr. Luna regarding Ms. Duell's participation in E.D.'s meetings about NSFL. Luna Dep. at 46, 62–63; Mobley Dep. I at 35. Ms. Mobley also informed Dr. McCaffrey that E.D. had previously presented the same flyers to her (Mobley) for approval, but that she had declined to approve them and told E.D. what she needed to do to fix them. McCaffrey Dep. I at 103.

Later, on September 3rd, at 11:57 a.m., Dr. McCaffrey emailed Ms. Duell to "clarify some points about student interest clubs and [NHS's] process," (Dkt. 157-3), informing her that "student interest clubs are 100% student driven and can have no involvement from any adult," which was why he viewed it as "unusual and [un]orthodox" for Ms. Duell to have attended the initial meeting he had with E.D. regarding the formation of NSFL. *Id.* The email further explained that Dr. McCaffrey had allowed their first meeting to continue, despite Ms. Duell's presence, because E.D. "did all of the talking and did a good job of representing what she wanted to do." *Id.* However, Dr. McCaffrey said, after E.D. spoke with Ms. Mobley about NSFL's flyers and was told that they were not appropriate for school, instead of revising the flyers, E.D. and Ms. Duell met with Mr. Luna again to discuss the posters, approval of which had previously been

denied by Ms. Mobley.  Consistent with what E.D. had been told by Ms. Mobley, Dr. McCaffrey reiterated in his email to Ms. Duell that:

> A poster cannot contain any content that is political or that could disrupt the school environment.  Club advertising posters only state the name of the club and the details of the meeting time and location.  When the students actually meet, they are able to talk about their common interests.

*Id.*  In his email, Dr. McCaffrey stated that, because he was no longer "confident that this club is a student-driven club," he "therefore [was] removing the club's approval to meet in the school."  *Id.*  Dr. McCaffrey also informed Ms. Duell that NHS was in the process of "revamping" its club approval process "to handle the large number of requests [the school was] getting along with the wide range of interest requests" and would not be taking new requests for student interest clubs until the new process was finalized "for the second semester."  *Id.*  Dr. McCaffrey advised Ms. Duell that, if E.D. wanted "to apply for her club again next semester, she [could] reach out to Mrs. Mobley in January and ask for the updated application."[3]  *Id.*

Dr. McCaffrey testified that the decision to revoke NSFL's club status was his alone and that he informed Dr. Niedermeyer of his decision only after he had sent the revocation email to Ms. Duell.  McCaffrey Dep. I at 108, 131; McCaffrey Dep. II at 128. Although E.D. was NSFL's president at the time of the revocation, Dr. McCaffrey did not send the September 3rd email to E.D. or otherwise notify her directly of the revocation.

---

[3] E.D. resubmitted her application as instructed and NSFL was reinstated as a student interest club at NHS in January 2022.

E.D. instead was informed by NSFL's faculty sponsor, Mr. McCauley, that NSFL's club status had been revoked.  E.D. Dep. I at 511–52, 53.

**Other Student Interest Clubs at NHS**

Prior to revoking NSFL's club status in the fall of 2021, Dr. McCaffrey had never revoked authorization for a student interest club.  In 2019, however, Dr. McCaffrey did receive a complaint that an adult was participating in NHS's Campus Crusade for Christ group, along with a threat of litigation by the Freedom from Religion Foundation.  Dr. McCaffrey investigated that complaint by watching videos of club meetings and determined that no adults had spoken during the meetings; he therefore took no corrective action in response to the complaint.  McCaffrey Dep. II at 135–36.  Other than this 2019 complaint, Dr. McCaffrey had dealt with no other issues regarding suspected adult involvement in a student interest club until the issue arose with NSFL.  McCaffrey Dep. II at 132.

NHS previously approved at least one other pro-life student interest club, about which there is no evidence that it was denied approval or ever had its club status revoked.  McCaffrey Dep. I at 147; Niedermeyer Dep. at 50–51.  Dr. McCaffrey, Ms. Mobley, and Mr. Luna all testified that in their personal views on abortion they are pro-life and thus their opinions align with the viewpoint and mission of NSFL.  McCaffrey Dep. at 148; Mobley Dep. I at 41–43; Luna Dep. I at 58.  Their actions were not motivated by any philosophic hostility to the purpose of the club.

**Social Media Discussion**

After NSFL's club status was revoked, Noblesville City Councilman Pete Schwartz posted on the Noblesville Schools Community Facebook page a copy of an email that E.D. had sent him regarding the revocation of NSFL's club status, in which she expressed her belief that the revocation was the result of "ideological targeting" and her desire to "get the word out" about the situation. Dkt. 154-2. Another Noblesville resident who is not a party to this litigation reposted a condensed version of E.D.'s email, omitting certain references in the reposting, including E.D.'s statements that she was not "a puppet, a Greta Thunberg" and that "Pastor Micah," a well-known local pastor and political candidate, believed many in the community would be supportive of her efforts. Dkt. 154-3. That same Noblesville resident also shared on social media a link to a news article about the revocation. These posts garnered a large response on social media, with various of the Defendants participating in the online discussions, as described below.

Defendant Eads commented on Councilman Schwartz's post: "I really think this is inappropriate for a councilman to post [E.D.'s email] to a public forum page." Dkt. 154-2. When Councilman Schwartz rejoined to inquire as to what was unprofessional about his conduct, Ms. Eads wrote, "[U]sing your position as a councilman to push your buddy, Pastor Micah's agenda here." *Id.* Councilman Schwartz's conceded that he had "really not [done] much" to investigate the situation before posting E.D.'s email to social media, prompting Ms. Eads to respond: "[S]o basically he didn't do anything other than post this to Facebook? Wow, tax dollars hard at work." *Id.* Later in the thread, Defendant Patterson-Jackson commented, "I got all I needed to know about the true intent and

15

purpose of this 'club' by the use of the two phrases: 'puppet, Greta Thunberg' and 'Pastor Micah.'  No thanks."  *Id.*  Ms. Eads replied to Ms. Patterson-Jackson's comment: "EXACTLY."  *Id.*

In response to the Noblesville resident's reposting of an edited version of E.D.'s email to Councilman Schwartz, Ms. Patterson-Jackson wrote: "You have deliberately and intentionally left out key parts of the original email, specifically her references to 'puppet, Greta Thunberg' and 'Pastor Micah's' endorsement.  You have absolutely lost all credibility at this point.  And as I said on that original post, there is no place for a club that endorses misogyny, bigotry, and conspiracy-driven politics in our public schools." Dkt. 154-3.  Defendant Tuesca "liked" this comment.  Dkt. 158-9.  In response to Ms. Patterson-Jackson's comment, several non-parties posted comments critical of her post. In response to those comments, Ms. Patterson-Jackson reiterated her concern that the excerpt of E.D.'s email that had been posted omitted relevant portions of the original email and stated that her "critique and questioning of misogyny, bigotry, and conspiracy-driven politics" stemmed from "the endorsement by Micah Beckwith" that was referenced in E.D.'s original email.  Dkt. 154-3.  Ms. Patterson-Jackson posted again on the thread, as follows: "There is no place for any club that endorses those things [misogyny, bigotry, and conspiracy driven politics].  If the Students for Life club truly doesn't, then by all means, they should be able to meet.  Once again, and for the final time, my criticism was based on the fact that according to the student the club is endorsed by Micah Beckwith, which, as I said, is the basis for my concern, as it is my opinion that he does, in fact, support those things."  *Id.*

16

With reference to NSFL's proposed flyers, Ms. Patterson-Jackson commented, "So out of curiosity, would you be good with club posters in the school for the Black Student Union that said 'Defund the Police?'"  Dkt. 158-6.  Defendants Rootes and Kizer both "liked" Ms. Patterson-Jackson's comment.  *Id.*  A non-party commented that the social media discussion appeared to be "proving [the] point" that "a bunch of adults were behind this [NSFL] group," and Defendant Schwingendorf-Haley "liked" that comment.  Dkt. 158-7.  Defendant Snider Pasko "liked" the following comment posted by another non-party: "Parent in on the formation meeting?  Already has legal representation?  I suppose I'm a skeptic, but it's almost like it was planned …."  Dkt. 158-8.  Ms. Tuesca "liked" several comments on these threads that she agreed with or found funny.  Tuesca Dep. at 22–38.

**The Instant Litigation**

On December 21, 2021, Plaintiffs filed their original complaint, which they later amended on January 11, 2022, alleging, *inter alia*, various violations of their First and Fourteenth Amendment rights and the Equal Access Act, as well as claims under the Indiana Constitution and various tort claims subject to the Indiana Tort Claims Act ("ITCA") notice provisions.  Defendants moved to dismiss all claims alleged against them, which motion was granted in part and denied in part.  In ruling on the motion to dismiss, the Court also *sua sponte* converted Defendants' motion to dismiss to one for summary judgment as to the ITCA notice issue and granted judgment in Defendants' favor on that issue.  However, upon reconsideration, the Court granted Plaintiffs' motion for reconsideration of the *sua sponte* conversion of the motion to dismiss and provided

the parties an opportunity to submit supplemental briefs and evidence on the ITCA notice issue, which they have now done.

Now before the Court are the parties' cross-motions for summary judgment as to the federal claims as well as the parties' supplemental submissions on summary judgment as to the ITCA notice issue.  These motions are fully briefed and ripe for ruling.

<u>**Legal Analysis**</u>

**I.      Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).  Because these are cross-motions for summary judgment and the same Rule 56 standards apply, our review of the record requires us to draw all inferences in favor of the party against whom a particular issue in the motion under consideration is asserted.  *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II.    Federal Claims

### A. Section 1983 and Equal Access Act Claims Against the Noblesville School District

Plaintiffs have framed almost all their Section 1983 claims, other than their individual capacity claims for First Amendment retaliation and Equal Access Act violations, only against the municipal entity, the Noblesville School District (the "District").[4]  Accordingly, the viability of these claims is governed by the requirements set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.[5]

Under *Monell*, "a municipal entity is not vicariously liable for the constitutional torts of its employees" and instead "may be liable only for conduct that is properly attributable to the municipality itself." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (internal quotations and citations omitted).  A constitutional deprivation may be attributable to a municipality only "when execution of a government's policy or custom inflicts the injury." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quotation marks and citation omitted).  A plaintiff can show that a constitutional violation resulted from the execution of a municipal policy or custom in the following

---

[4] Plaintiffs have also framed these claims as against Defendant NHS, but do not dispute that NHS is not a suable entity separate from the school district.  Accordingly, all claims against NHS as such are hereby dismissed.

[5] It is true, as Plaintiffs argue, that legal standards beyond those set forth in *Monell* govern whether their constitutional rights were violated by Dr. McCaffrey's decision to revoke NSFL's club status.  However, as we have previously explained to Plaintiffs, they have not brought these claims against Dr. McCaffrey in his individual capacity.  To instead hold the Noblesville School District responsible for any such violation, as Plaintiffs have sought to do in this litigation, they must show not just that they suffered a constitutional injury, but that that injury is directly attributable to the governmental entity itself under *Monell*.

three ways: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)).

Here, Plaintiffs make no attempt to show that the District had either an express policy or a widespread practice or custom that caused NSFL's revocation. Instead, Plaintiffs argue that the District's liability under *Monell* arises from the violation that was caused by Dr. McCaffrey, a final policymaker over student club policy at NHS. Specifically, Plaintiffs argue, based on testimony from the school board president and other school board members, that the school board was not involved in promulgating or approving procedures governing school clubs, but that the school district had delegated policymaking authority related to student interest clubs at NHS to Dr. McCaffrey.

In determining whether a municipal officer such as Dr. McCaffrey is acting as a final policymaker, courts look to state and local law. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In Indiana, courts have held that the final policymaker for a public school corporation, such as the District, is the board of school trustees. *See Harless v. Darr*, 937 F. Supp. 1339, 1349 (S.D. Ind. 1996) ("[T]he school board and not the [p]rincipal or the [s]uperintendent has final policy making authority under Indiana law."); *accord Wesley v. South Bend Cmty. Sch. Corp.*, No. 3:19-cv-00032-PPS-MGG, 2019 WL 5579159, at *7 (N.D. Ind. Oct. 29, 2019) ("In Indiana, the final policymaker for a public school corporation is its board of school trustees."); *Herndon v. South Bend Sch. Corp.*,

No. 3:15 CV 587, 2016 WL 3654501, at *1 (N.D. Ind. July 8, 2016) ("[U]nder Indiana law, it is the school board, and not the principal that has final policymaking authority.").

Here, Plaintiffs contend that the Noblesville Board of School Trustees delegated its policymaking authority regarding student clubs to Dr. McCaffrey as principal of NHS. In support of their argument, Plaintiffs point to the fact that Dr. McCaffrey, acting on his own, made the decision to revoke NSFL's club status, without seeking direction or approval from either the superintendent or the school board and without having his decision subjected to official review.  However, "[u]nder the delegation theory, the person or entity with final policymaking authority must delegate the power to make *policy*, not simply the power to make *decisions*." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (emphasis added).  Thus, the fact that Dr. McCaffrey had discretionary authority to make decisions regarding student interest clubs at NHS does not render him the final decision maker regarding policies for purposes of § 1983 municipal liability.  *See Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014) ("[S]imply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter."); *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013) ("[T]he mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority.  There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.") (quoting *Valentino v. Village of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir. 2009)); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) (holding

21

that *Monell* liability is limited "to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority").

Here, the kinds of day-to-day discretionary decisions that Dr. McCaffrey and other NHS administrators were authorized to make regarding the posting of flyers in the school and student club approval do not rise to the level of policymaking decisions made on behalf of the District, the governmental entity that Plaintiffs have sued.  *See Harless*, 937 F. Supp. at 1349 (holding that the delegation of authority under Indiana law to the principal to make "ad hoc decisions" to maintain order within the school was distinguishable from the school board's authority to create final policy).  The evidence adduced by the parties establishes that it is the Noblesville School Board who has final authority over NHS's policies, which are set forth in the Student Handbook.  When asked at his deposition what role the Noblesville School Board holds regarding student groups at a high school or middle school in the District, Noblesville School Board President Joe Forgey testified that, "other than [the principal] taking *our* policy and administrating it, none."  Forgey Dep. at 24 (emphasis added).

Mr. Forgey did express some confusion regarding whether he would have seen NHS's policies regarding student clubs and whether the Board has final approval of the Student Handbook, testifying that he "think[s] it comes to a vote to the board to approve the handbooks," but was "not sure" and "didn't want to say for sure."  *Id.* at 33.  However, Dr. Niedermeyer and Dr. McCaffrey both testified that NHS policies which are contained in Noblesville Schools' Student Handbooks are drafted by the principal and curriculum

team at each school and then presented to the School Board for approval every school year.  Dkt. 166-1 at 21, 42; Dkt. 166-4 at 24–25.

Mr. Forgey's uncertainty regarding whether he would have seen policies regarding student clubs and whether the Noblesville School Board is responsible for approving NHS's Student Handbook is not enough to create a genuine issue of material fact on this issue.  Federal Rule of Evidence 201 permits a court to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and such notice can be taken *sua sponte* and at any stage in a proceeding.  We therefore take judicial notice of the agenda and minutes of the June 15, 2021 regular school board meeting of the Noblesville School Board, which are accessible from the Noblesville Schools website and reflect that, on that date, the Board approved the 2021–2022 Noblesville Elementary and Secondary Student/Parent Handbooks in a 4 to 1 vote.  *See* Section 6.7, Noblesville School Board Meeting Agenda for June 15, 2021 Regular School Board Meeting, go.boarddocs.com/in/noblesville/Board.nsf/Public (last visited March 13, 2024); *see*, *e.g.*, *Miller v. Goggin*, 672 F. Supp. 3d 14, 28 n.9 (E.D. Penn. 2023) (noting that the court had previously taken judicial notice of school board meeting minutes).  Accordingly, although Dr. McCaffrey may have had discretionary authority over *decisions* affecting student clubs within NHS, the evidence before us clearly shows that the Noblesville School Board, not Dr. McCaffrey, was the entity responsible for establishing final government *policy* covering such matters.

Finally, to the extent that Plaintiffs argue that the lack of policies in the NHS Student Handbook regarding the formation and approval of student interest clubs and the

posting of flyers to advertise such clubs supports an inference that the Noblesville School

Board delegated its final policymaking authority on such matters to Dr. McCaffrey, such

an argument is not well-made.  Seventh Circuit law is clear that "the absence of a written

policy is not enough to support an inference that final policymaking authority has been

delegated to a subordinate." *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991

F.2d 1316, 1325 (7th Cir. 1993).

     Although the absence of a policy is not enough to show a delegation of final

policymaking authority to an employee, under certain circumstances the lack of a policy

can nonetheless subject the governmental entity to liability under *Monell*.  "But proving

*Monell* liability based on an absence of policy is difficult, because 'a failure to do

something could be inadvertent and the connection between inaction and a resulting

injury is more tenuous,' and, therefore 'rigorous standards of culpability and causation

must be applied to ensure that the municipality is not held liable solely for the action of

its employee." *Watson v. Ind. Dep't of Correction*, No. 18-02791, 2020 WL 5815051, at

*4 (S.D. Ind. Sept. 30, 2020) (quoting *J.K.J. and M.J.J. v. Polk Co. and Christensen*, 960

F.3d 367, 378 (7th Cir. 2020)).  Insofar as Plaintiffs here have referenced the District's

failure to enact a policy regarding student organization formation as the cause of their

constitutional injuries, no such claim has been developed in a legally sufficient manner.

     To hold the District liable under *Monell* for the failure to enact a policy, Plaintiffs

must show that the District had "'actual or constructive knowledge that its agents [such as

those approving student club status] will probably violate constitutional rights' in the

absence of a [relevant] policy." *Watson*, 2020 WL 5815051, at *4 (quoting *Glisson v. Ind.*

24

*Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017)).  In addition, to establish liability for the absence of a policy, a plaintiff typically must provide "more evidence than a single incident."  *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).  Again, Plaintiffs' briefing has fallen short of establishing that the District knew or had reason to know that, without a formal policy regarding student interest club formation, its school administrators were likely to permit, deny, or revoke a club's status based upon the club's viewpoint.  As Defendants argue, the evidence shows that NHS administrators routinely approved the formation of student groups with a variety of ideologies and political viewpoints, including Young Republicans, Young Democrats, Campus Crusade for Christ, Fellowship of Christian Athletes, and Gender and Sexuality Alliance.  We have been presented no evidence showing that any NHS student interest club had previously been denied or revoked for any reason, let alone for the content of the club's speech. Plaintiffs have thus failed to adduce the necessary evidence to prove that "there is a true municipal policy at issue, not a random event" as is required to hold the District responsible for a gap in policy.  *Id.*

For the foregoing reasons, we find that Plaintiffs have failed to show that their constitutional injury was caused by an official policy, widespread practice or custom, or decision by a final policymaker of the governmental entity they have sued.  The District is thus entitled to summary judgment in its favor on Plaintiff's § 1983 claims against it, to wit, Counts I (First Amendment freedom of association), II (First Amendment freedom of speech), III (Fourteenth Amendment due process), IV (Fourteenth Amendment equal protection), V (First Amendment retaliation), and Count VII (Equal Access Act).

Defendant's summary judgment motion is therefore <u>GRANTED</u>, and Plaintiff's motion is correspondingly <u>DENIED</u> as to these claims brought by Plaintiffs against the Noblesville School District.

### B.  Individual Capacity Claims Against Defendants Niedermeyer, Mobley, and Luna

Plaintiffs assert § 1983 claims for First Amendment retaliation and Equal Access Act violations against Defendants Niedermeyer, Mobley, and Luna in their individual capacities, based on the revocation of NSFL's club status.  However, the undisputed evidence establishes that the revocation decision was made by Dr. McCaffrey alone, and Plaintiffs do not argue otherwise.  Because the evidence shows that neither Dr. Niedermeyer, Ms. Mobley, nor Mr. Luna was personally involved, consulted, or otherwise acquiesced in the decision to revoke NSFL's club status, these defendants cannot be held liable for whatever injury that revocation caused Plaintiffs.  *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (internal quotation marks and citation omitted).

Accordingly, Defendants' motion for summary judgment is <u>GRANTED</u> as to the individual capacity First Amendment retaliation (Count VI) and Equal Access Act (Count VII) claims brought against Defendants Niedermeyer, Mobley, and Luna in their individual capacities, and Plaintiffs' motion for summary judgment on these claims is therefore <u>DENIED</u>.

### C. Individual Capacity First Amendment Retaliation Claims Against Defendants McCaffrey, Snider-Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca and Eads

We turn next to address Plaintiffs' First Amendment retaliation claims brought against the remaining Defendants each sued in their individual capacity.  Plaintiffs allege that, in retaliation for E.D.'s expressed pro-life views, Defendant McCaffrey revoked NSFL's club status and Defendants Snider Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads created a hostile environment for E.D. by participating in a public discussion on social media regarding NSFL's revocation, including writing negative comments and "liking" posts critical of NSFL.

To prevail on their First Amendment retaliation claims, Plaintiffs must show that: (1) E.D. engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was "at least a motivating factor" in Defendants' decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation," *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020), which element may be shown using either direct or circumstantial evidence, such as "suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other[s] … in the protected group." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009) (citation omitted).  If Plaintiffs succeed in establishing a prima facie claim, the burden shifts to Defendants to rebut the claim and establish that the deprivation "would have occurred regardless of the

27

protected activity." *Manuel*, 966 F.3d at 680 (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)).  If such a showing is made, the burden then shifts back to Plaintiffs to show that Defendants' proffered non-retaliatory reason "is pretextual or dishonest."  *Id.*

Having set forth the legal principles applicable to Plaintiffs' First Amendment retaliation claims, we turn next to address the merits of these claims.

### 1. First Amendment Retaliation Claim Against Defendant McCaffrey

Plaintiffs argue that they are entitled to summary judgment on their First Amendment retaliation claim against Dr. McCaffrey because the evidence establishes that he revoked NSFL's club status shortly after E.D. had sought approval to post flyers containing pro-life messages and images to advertise the NSFL's call-out meeting. Specifically, Plaintiffs argue that, when E.D. requested approval from NHS administrators to post flyers related to the pro-life movement to advertise NSFL's call-out meeting, she was given conflicting information from various administrators regarding the rules governing what could be posted, and that, within hours of seeking to clarify the rules at a meeting with her mother and Mr. Luna, Dr. McCaffrey revoked NSFL's club status.  Plaintiffs claim, based on the conflicting information they say they were given regarding permissible content for the flyers and the proximity in time between E.D. seeking to clarify the rules and secure approval for her flyers and Dr. McCaffrey's revocation decision, that they have shown that their protected First Amendment activity was at least a motivating factor in Dr. McCaffrey's decision to revoke NSFL's club status.

Defendants rejoin that summary judgment should instead be entered in Dr. McCaffrey's favor because Plaintiffs have failed to establish that the viewpoint of the

proposed flyers or any other protected First Amendment activity on Plaintiffs' part was a motivating factor in the revocation decision.  Rather, the evidence establishes that Dr. McCaffrey revoked NSFL's club status because of Plaintiffs' conduct—not their speech—referencing his concern about the involvement of E.D.'s mother in what was supposed to be a student-run club and his belief that E.D.'s conduct of "shopping" administrators in an effort to find one who would approve the flyer that had previously been rejected by two other NHS administrators for failing to comply with the rules applicable to NHS student interest club flyers was insubordinate behavior.

There can be no dispute that Plaintiffs' formation of a pro-life club and their efforts to advertise that club in the same manner afforded to all other student interest clubs at NHS constitutes protected activity under the First Amendment.  It is also undisputed that the revocation of NSFL's club status is the kind of deprivation that would likely deter future First Amendment activity.  Accordingly, Plaintiffs have satisfied these first two elements of their First Amendment retaliation claim against Dr. McCaffrey.  However, we find that Plaintiffs have failed to establish the third element of their claim, to wit, that their protected First Amendment activity was a motivating factor in Dr. McCaffrey's revocation decision.

To prove that their protected speech activity was at least a motivating factor in Dr. McCaffrey's decision, Plaintiffs rely primarily on the proximity in time between E.D.'s request to post flyers advertising NSFL's call-out meeting and Dr. McCaffrey's revocation decision.  It is well-settled Seventh Circuit law, however, that "[s]uspicious timing alone will rarely be sufficient to create a triable issue because '[s]uspicious timing may be just

29

that—suspicious—and a suspicion is not enough to get past a motion for summary judgment.'" *Manuel*, 966 F.3d at 681 (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)).  In any event, rather than being suspicious in an adverse sense, the timing here supports Dr. McCaffrey's proffered non-retaliatory reasons for his decision, to wit, that it was Plaintiffs' conduct, not their protected speech activity, that motivated his decision to revoke NSFL's club status.

Dr. McCaffrey, a self-professed pro-life supporter,[6] approved NSFL's club status in August 2021 with full knowledge of its mission and pro-life message and allowed Plaintiffs to participate in NHS's activities fair later that same month at which E.D. represented NSFL and wore an "I am the pro-life generation" t-shirt and displayed a tri-fold poster containing that same statement as well as NSFL's pro-life mission statement, all without objection from any NHS administrator.  Dr. McCaffrey's decision to revoke NSFL's club status was made only after he learned that E.D. and her mother had met with Mr. Luna on September 3, 2021 in an attempt to secure approval for E.D.'s proposed flyer advertising NSFL's call-out meeting, despite the fact that flyer had already been rejected by two other NHS administrators—NHS Assistant Principal Mobley, and NSFL's faculty advisor, Mr. McCauley.

---

[6] Plaintiffs maintain that Dr. McCaffrey's views are irrelevant.  While clearly not dispositive, intent may in some cases be relevant to the inquiry of whether a causal relationship existed between the protected speech and the adverse action alleged.  *See Whitfield v. Spiller*, 76 F.4th 698, 712 (7th Cir. 2023) (recognizing that "[a]t times, it is necessary to determine what exactly motivated a defendant," if that evidence sheds light on causation).

Immediately following his meeting with E.D. and Ms. Duell, Mr. Luna reported to Dr. McCaffrey that he felt it had been a "three-way" discussion among himself, E.D., and her mother.[7]   At that time, Dr. McCaffrey also learned that Ms. Mobley and Mr. McCauley had each previously instructed E.D. on how to fix her flyer so that it could be approved, and, although E.D. had assured Mr. McCauley that she would make the changes, she instead ignored their instructions and, accompanied by her mother, attempted to obtain approval from Mr. Luna to post the original flyer.

Contrary to Plaintiffs' contention that E.D. was given inconsistent information regarding what changes she needed to make to her proposed flyers before they could be posted in NHS hallways and thus needed to consult Mr. Luna for clarification, the undisputed evidence shows that she was given clear and consistent direction from each administrator she consulted.  Ms. Mobley and Mr. McCauley both told E.D. that her flyer should list the name of her club and the date, time, and location of the call-out meeting, and that the photograph on the proposed flyer (which pictured students holding signs that included messages such as "Defund Planned Parenthood") needed to be removed.  Ms. Mobley went on to explain that NHS's Young Republican group, for example, "does not display items for the Republican Party" on their call-out flyers; rather, the call-out posters "just simply state the club name and meeting/call-out information" and "[t]hen obviously at the club meeting and call-out, you guys can discuss whatever is your topic at hand."

---

[7] Although Plaintiffs argue that Ms. Duell's attendance was due to a family rule that E.D. not be alone with adults, particularly men, there is no evidence that either Dr. McCaffrey or Mr. Luna was ever made aware of that rule at the time of these meetings.

31

Dkt. 158-5.  Nor is there any indication that E.D. was confused or otherwise upset by these instructions.  To the contrary, she responded to Mr. McCauley, "Sounds good, thanks!  I'll get to work on making the flyers." *Id.*

The next morning, however, E.D. and her mother met with Mr. Luna and presented him with the original flyer for his approval.  Consistent with Ms. Mobley's and Mr. McCauley's instructions, Mr. Luna told E.D. that the photograph needed to be removed before the flyer could be posted.  When E.D. told him that other flyers posted at NHS contained images, he explained that her photograph needed to be removed because it was political.  He told E.D. that he believed her flyer could be approved once the "Defund Planned Parenthood" sign was removed, but that he was not usually the administrator who approved flyers.

Dr. McCaffrey, Mr. Luna, and Ms. Mobley all testified consistently that their discussion following Mr. Luna's meeting with E.D. and her mother centered around their shared concern regarding Ms. Duell's participation in the meeting, which represented the second NSFL-related meeting she had attended within approximately one month's time, as well as the inappropriateness of E.D.'s having gone to Mr. Luna after she had already been instructed on how to fix her flyers so that they could be approved and posted in the NHS hallways.  McCaffrey Dep. II at 103; *accord* Mobley Dep. II at 35; Luna Dep. II at 46.  There is no evidence of any concern being raised at that time by Dr. McCaffrey or the other NHS administrators regarding NSFL's pro-life mission or E.D.'s right to advertise NSFL's call-out meeting in the same manner as other NHS student

organizations, only that E.D. had eschewed those rules and then, together with her mother, had sought approval to post the flyer from a different administrator.

Within a few hours of this discussion, Dr. McCaffrey informed Ms. Duell of his decision to temporarily revoke NSFL's club status.  In that email, Dr. McCaffrey expressed his concerns regarding Ms. Duell's involvement in NSFL and her attendance at a meeting at which E.D. attempted to secure approval for her flyer from Mr. Luna without making the changes necessary to comply with the instructions that she had been given by other NHS administrators.  Consistent with what E.D. had been told by Ms. Mobley, Mr. McCauley, and Mr. Luna, Dr. McCaffrey reiterated in his email to Ms. Duell that flyers advertising clubs at NHS must "state the name of the club and the details of the meeting time and location" and "cannot contain any content that is political or could disrupt the school environment."  Dkt. 157-3.

This timeline supports Dr. McCaffrey's purported non-retaliatory reasons for revoking NSFL's club status: he had approved NSFL as a student organization with full knowledge of its pro-life message, permitted Plaintiffs to participate in the activities fair and promote NSFL using pro-life messaging, and took action against Plaintiffs only after E.D. and her mother met with Mr. Luna in what Dr. McCaffrey viewed as an attempted end-around Ms. Mobley's and Mr. McCauley's instructions.  Plaintiffs in contrast have pointed to no evidence that casts any doubt on the veracity of Dr. McCaffrey's belief that Ms. Duell's participation at both meetings between E.D. and NHS administrators about NSFL raised concerns by school officials that NSFL was not entirely student-run. Plaintiffs cite the fact that Dr. McCaffrey admitted that E.D. had represented herself well

in the first meeting as evidence that his concern regarding Ms. Duell's involvement was disingenuous, but Dr. McCaffrey explained in his revocation email that his concerns increased following E.D.'s mother's attendance at a second meeting and participation in E.D.'s attempt to obtain Mr. Luna's approval for the original flyer.

To the extent Plaintiffs argue that they had a protected First Amendment right to post a flyer containing political speech on NHS's walls, this argument is a non-starter. Plaintiffs maintain that the Supreme Court's seminal decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) governs this analysis, in which "[b]alancing the speech rights of students with the need for school officials to set standards for student conduct, the Court held that restrictions on student speech are constitutionally justified if school authorities reasonably forecast that the speech in question 'would materially and substantially disrupt the work and discipline of the school' or invade the rights of others."  *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 423 (7th Cir. 2022) (quoting *Tinker*, 393 U.S. at 513).  The "substantial disruption" standard requires "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" or an "undifferentiated fear or apprehension of disturbance … to overcome the right to freedom of expression."  393 U.S. at 508, 509. Plaintiffs argue that there is no evidence on the record before us to support a finding that *Tinker*'s substantial disruption standard has been satisfied here; thus, E.D. must be deemed to have been engaging in protected First Amendment activity when she sought to post her flyer that included the "Defund Planned Parenthood" message on school walls.

Since *Tinker*, however, the Court has "identified 'three specific categories of speech that schools may regulate' regardless of whether the circumstances satisfy *Tinker*'s 'substantial disruption' standard." *Sonnabend*, 37 F.4th at 423.  One of these categories is student speech that others "might reasonably perceive to bear the imprimatur of the school." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1998).  At issue in *Kuhlmeier* was the issue of school officials' authority to maintain editorial control over the content of a high school student newspaper that was school-sponsored, supported, and supervised.  The Court found under those circumstances that the editorial content of the newspaper, although written by students, carried the imprimatur of the school.  "The issue, then, was not the same as in *Tinker*: the question was not whether the school must *tolerate* particular student speech but whether it must *affirmatively promote* particular student speech." *Sonnabend*, 37 F.4th at 424.  Rather than apply *Tinker*, the *Kuhlmeier* Court instead applied established First Amendment forum doctrine.  484 U.S. at 267–70.  Concluding that the school-sponsored newspaper was a non-public forum, the Court held that school officials were entitled to regulate its contents "in any reasonable manner," which, in the public-education setting, permits regulation "reasonably related to legitimate pedagogical concerns." *Id.* at 273.

The student expression at issue in our case is more akin to that addressed in *Kuhlmeier* than *Tinker*.  Here, E.D. was not prohibited, for example, from personally expressing a political message on a t-shirt she wore in the classroom nor was she told she would be prohibited from sharing a political message, including "Defund Planned Parenthood," if she so desired at NSFL meetings.  NHS administrators told her only that

she could not include such a political message on flyers that would be displayed on school walls to advertise NSFL's call-out meeting.  Hanging flyers on school walls advertising clubs that meet during school hours and on school grounds with a faculty advisor is expressive activity that could reasonably be perceived to bear the imprimatur of the school.  As Defendants argue, it would be reasonable for parents and other members of the public entering NHS for sporting events, student concerts, theater performances, parent-teacher conferences, or any other reason who observed such flyers displayed on school walls to erroneously attribute any political messaging they contained to the school district or the school itself, despite the clubs being student-run. Accordingly, we apply that First Amendment forum analysis, rather than the *Tinker* standard as the appropriate template here.

The evidence before us establishes that, during the time period relevant to this litigation, NHS administrators limited the information and materials that students could post on the walls of the school and members of the general public were not permitted to post flyers on school walls.  Student interest clubs at NHS were permitted to advertise their call-out meetings by posting flyers on the walls in designated areas of the school containing the club name and details regarding the date, time, and location of the call-out meeting after receiving approval from an administrator, thereby establishing a nonpublic forum for speech under First Amendment jurisprudence.  This term ("nonpublic forum") denotes areas "where the government controls public property which is not, by tradition or designation, a forum for public communication, and is open only for selective access." *John K. MacIver Inst. for Pub. Policy*, 994 F.3d 602, 609 (7th Cir. 2021) (citing *Perry*

36

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983)).  In such locations, "[t]he government, like other private property holders, can reserve property for the use for which it was intended, 'as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry*, 460 U.S. at 46); *see also Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

The evidence before use here shows that, during the relevant time period, other than identifying the name of the student organization (which might in some cases be political, such as the Young Republicans), no advertising flyers for NHS student organizations were permitted to include political speech, regardless of viewpoint.  The evidence further supports Defendants' contention that such a prohibition has a valid educational purpose as it ensures the school does not become a facilitator of warring political messages on its walls that could unnecessarily disrupt the learning environment. As the Supreme Court has recognized, schools "must [] retain the authority to refuse … to associate the school with any position other than neutrality on matters of political controversy."  *Kuhlmeier*, 484 U.S. 272.  Thus, we will not hold, for obvious reasons, that a prohibition on political speech in flyers advertising student clubs that are displayed on school walls "has no valid educational purpose" as would "require judicial intervention to protect students' constitutional rights."  *Id.* at 273.

Although Plaintiffs contend that E.D. was provided inconsistent and unclear information regarding this rule, that contention is not supported by the evidence. As detailed above, each administrator E.D. consulted told her that her flyer should contain only NSFL's name and the pertinent details regarding the date, time, and location of the call-out meeting and that the photograph depicting students holding protest signs reading, among other things, "Defund Planned Parenthood," would need to be removed before the flyer could be posted. No administrator ever told E.D. that she was prohibited altogether from advertising NSFL's call-out meeting, that her flyer would be rejected even if she removed the politically-charged photograph, or that she would be restricted in some way from speaking freely on the topics of her choice at NSFL's meetings.

Nor does the evidence support Plaintiffs' contention that NHS administrators applied the prohibition inconsistently on political speech in student organization advertising flyers. The only specific example cited by Plaintiffs of a student interest club at NHS that was permitted to post flyers containing political speech was a flyer advertising the Black Student Union that contained a graphic at the bottom left-hand corner of the flyer depicting three raised fists of varying skin tones. Even assuming that the image displayed on the Black Student Union flyer is properly construed as political speech, the only evidence cited by Plaintiffs to establish that the flyer was ever posted at NHS or that it was posted with the approval of any NHS administrator is the testimony of Ms. Mobley. However, Ms. Mobley testified only that, while she "[p]ossibly" may have seen the flyer posted at NHS, it was "not something [she could] remember that [she] walked by." Mobley Dep. I at 43–44. When asked if she had approved the flyer, she said

38

she had not, and when asked if she could tell from looking at the flyer whether it had been approved, she responded, "[n]o, not really."  *Id.* at 44.

Moreover, the Black Student Union flyer contained neither a take-down date nor the initials of the administrator who approved it, which Dr. McCaffrey testified were typically required before a flyer could be posted on the wall at NHS.  The fact that a single, unauthorized flyer containing political speech may on one occasion have been posted at NHS is not sufficient evidence to establish that the prohibition on political speech was enforced in a viewpoint discriminatory way by NHS administrators.  Because viewpoint neutral subject matter restrictions are permissible in a limited forum such as that at issue here, Plaintiffs have not shown that they had a protected First Amendment right to post a flyer advertising NSFL's call-out meeting that contained political speech.

In sum, the adduced evidence would not permit a reasonable jury to conclude that Plaintiffs' protected First Amendment activity was a motivating factor in Dr. McCaffrey's decision to revoke NSFL's club status.  Rather, the evidence establishes that Dr. McCaffrey's revocation decision was motivated, not by Plaintiffs' protected First Amendment activity, to wit, forming NSFL and seeking to advertise their call-out meeting in a manner equal to all other student organizations at NHS, but instead by their conduct, namely, what he believed were E.D.'s and her mother's efforts to "shop" administrators to find one who would approve a flyer advertising NSFL's call-out meeting that, contrary to the constitutionally-permissible restriction on political speech applicable to NHS student organization advertising flyers, contained a political message.

39

Plaintiffs have failed to establish that they had a First Amendment right to post their political speech on the school walls.  Accordingly, they cannot show that Dr. McCaffrey's decision to revoke NSFL's club status based on E.D.'s efforts, with her mother's knowledge and participation, to find an administrator who would let her do so was a decision made in retaliation for Plaintiffs' protected First Amendment activity.  For these reasons, Plaintiffs' First Amendment retaliation claim against Dr. McCaffrey does not survive summary judgment.  Defendants' summary judgment motion on this claim is <u>GRANTED</u> and Plaintiffs' corresponding request for summary judgment is <u>DENIED</u>.

### 2. First Amendment Retaliation Claim Against Defendants Snider-Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads

We turn next to Plaintiffs' First Amendment retaliation claim against Defendants Snider-Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads. The specific complaint against them is that they each personally commented and/or "liked" others' comments on social media in response to two posts from nonparties sharing an email E.D. sent to Noblesville City Councilman Pete Schwartz regarding the revocation of NSFL's club status.  Even if we assume that Defendants' conduct constitutes activity "under the color of law," as required under § 1983, Defendants are entitled to summary judgment on this claim because Plaintiffs have failed to establish the second essential element of their First Amendment retaliation claim, to wit, that an adverse action was taken against them.

For purposes of First Amendment retaliation, an action is adverse if it is "likely [to] deter a person of ordinary firmness from continuing to engage in protected activity."

*Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) (citations omitted).  As Defendants

posit, where, as here, the alleged adverse action "is in itself speech," that "[r]etaliatory

speech is generally actionable only in situations of 'threat, coercion, or intimidation that

punishment, sanction, or adverse regulatory action will immediately follow.'"  *Novoselsky*

*v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) (quoting *Hutchins v. Clarke*, 661 F.3d 947,

956 (7th Cir. 2011)).  Although "[i]n certain cases, a public official may also face liability

where he retaliated by subjecting an individual to 'embarrassment, humiliation, and

emotional distress,'" such cases are "usually limited to the release of 'highly personal and

extremely humiliating details'" to the public.  *Id.* (quoting *Hutchins*, 661 F.3d at 957).

Short of these extremes, "the First Amendment gives wide berth for vigorous debate …."

*Id.*

Defendants maintain, and we agree, that, even viewing the evidence in the light

most favorable to Plaintiffs, none of Defendants' social media activity "rise[s] to the level

of threat, coercion, intimidation, or profound humiliation."  *Id.* at 357; *see also X-Men*

*Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (holding that legislators' public

accusations that private security firm was part of a hate group and practiced "racism,

gender discrimination, anti-semitism, and other religious discrimination" fell short of

"any semblance of threat, coercion, or intimidation").  In fact, the majority of the

comments challenged by Plaintiffs were directed at or were critical of third parties not

involved in this litigation and thus cannot be said to have qualified as retaliation against

E.D.  Plaintiffs do not argue otherwise or posit that the applicable legal standard is

relaxed or in some relevant way altered when a minor is involved.  Indeed, Plaintiffs,

having failed to address this argument anywhere in their responsive briefing, have waived it. *See*, *e.g.*, *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (quotation marks and citation omitted). Accordingly, Plaintiffs' First Amendment retaliation claim against Defendants Snider-Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads cannot survive summary judgment.[8]

### D. Equal Access Act Claim Against Individual Defendants

Under the Equal Access Act, it is

unlawful for any public secondary school which receives Federal financial assistance and which has a limited public forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of religious, political, philosophical, or other content of the free speech at such meetings.

20 U.S.C. § 4071(a). Under this statute, a limited public forum is created "whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." *Id.* § 4071(b).

Plaintiffs claim that Dr. McCaffrey violated the Equal Access Act by revoking NSFL's club status and by denying them the right to conduct meetings due to the content

---

[8] Even if Plaintiffs had managed to establish a constitutional violation, Defendants would still be entitled to summary judgment on qualified immunity grounds, given Plaintiffs' failure to cite any analogous case establishing that Plaintiffs' First Amendment right to be free from such social media commentary was clearly established at the time Defendants engaged in the challenged conduct. *See Siddique v. Laliberte*, 972 F.3d 898, 903 (7th Cir. 2020) (holding that the plaintiff bears the burden of establishing that the federal constitutional right alleged to be violated was "clearly established" at the time of the alleged violation to avoid dismissal based on qualified immunity and that "the clearly established law must be 'particularized' to the facts of the case").

of their speech at such meetings.[9]  This claim fails for the same reasons Plaintiffs' First Amendment retaliation claim against Dr. McCaffrey failed.  The evidence establishes that Dr. McCaffrey did not revoke NSFL's club status because of the content of Plaintiffs' speech at their meetings.  Nor did he engage in viewpoint discrimination or otherwise deny NSFL the right to announce or advertise its meetings "on equal terms" with other student organizations at NHS.  *See Gernetzke*, 274 F.3d at 466 ("Had the school, therefore, while permitting the Bible Club to meet on school premises, forbidden it to announce its meetings or otherwise compete on equal terms with comparable but nonreligious student groups, it would have violated the [Equal Access] Act. … But there is no evidence of discrimination against the Bible Club.").  Accordingly, Dr. McCaffrey is entitled to summary judgment on Plaintiffs' Equal Access Act claim.  For all these reasons, Defendants' motion for summary judgment on this claim is <u>GRANTED</u> and Plaintiffs' summary judgment motion is <u>DENIED</u>.

### III.   State Law Claims

#### A.  Indiana Constitution

Plaintiffs claim that Defendants Noblesville School District, Dr. Niedermeyer, Dr. McCaffrey, Ms. Mobley, Mr. Swafford, and Mr. Luna violated Article I, Section 9 of the

---

[9] In their briefing, Plaintiffs also argue that it was a violation of the Equal Access Act for NHS administrators to deny NSFL the privilege of advertising political speech in school hallways, having permitted other clubs to do so.  However, the only Equal Access Act claim asserted in Plaintiffs' amended complaint and statement of claims is based on the revocation of NSFL's club status and Defendants' failure to allow Plaintiffs "to conduct meetings due to the content of their speech."  Dkt. 140.  Plaintiffs are prohibited from raising a new theory of liability under the Equal Access Act for the first time on summary judgment.

Indiana Constitution by revoking NSFL's club status, thereby "restricting [Plaintiffs'] expressive activity." Am. Compl. ¶ 541. Plaintiffs seek a declaration that Defendants violated the free speech provisions of Article I, Section 9 of the Indiana Constitution, a declaration "that NSFL is a valid student group at NHS," and an injunction "against NHS's revocation of the student organization NSFL."[10] *Id.* at 63, ¶¶ f–h.

For the foregoing reasons, we find that Plaintiffs have failed to establish entitlement to injunctive or declaratory relief under the Indiana Constitution. It is well-established under Indiana law that "injunctive relief is improper when the applicant cannot demonstrate the present existence of an actual threat that the action sought to be enjoined will come about." *Kennedy v. Kennedy*, 616 N.E.2d 39, 42 (Ind. Ct. App. 1993). Nor is injunctive relief appropriate "simply to eliminate a possibility of a future injury." *Id.* Here, NSFL's club status was revoked on September 3, 2021 and reinstated approximately four months later in January 2022. To our knowledge, NSFL has been active at NHS since that time, and Plaintiffs have presented no evidence that any imminent or actual threat of revocation exists. Accordingly, there are no grounds to issue an injunction "against NHS's revocation of the student organization NSFL" as Plaintiffs request.

"It is also too late for a declaratory judgment because it could do [Plaintiffs] no practical good." *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 860 (7th Cir. 2018). NSFL was reinstated as a student interest club at NHS in January 2022 and has been recognized

---

[10] We previously held that Plaintiffs are not entitled to seek damages for their claim under the Indiana Constitution.

as a valid student organization since that time.  Courts "cannot grant declaratory relief when there is no 'immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest.'"  *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty., Fla.*, 842 F.3d 1324, 1330 (11th Cir. 2016) (citing *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974)); *accord UWM Student Ass'n*, 888 F.3d 854 at 860–61 ("[A]ctions that the [defendants] allegedly took several years ago … could no longer affect plaintiffs in a real or immediate way and are not continuing or 'brooding' with a substantial adverse effect on plaintiffs' interests.").  Here, the action that Plaintiffs contend adversely affected their interests was Dr. McCaffrey's revocation decision.  Because NSFL's status has since been reinstated and Plaintiffs have presented no evidence that its temporary revocation restricts Plaintiffs' current ability to engage in expressive activity, their request for a declaratory judgment would at most serve "to secure emotional satisfaction from a declaration that they were wronged," but vindication alone does not justify declaratory relief.  *UWM Student Ass'n*, 888 F.3d at 862.

For these reasons, Defendants are entitled to summary judgment as to Plaintiffs' claims brought pursuant to the Indiana Constitution.  Plaintiffs' request for summary judgment on these claims is therefore denied.

### B.  Tort Claims

The following state law tort claims remain as a part of this litigation: Count VIII (Violation of School Policies Against Bullying); Count XI (Libel, Slander, and Defamation); Count XI (Intimidation and Bullying); Count XIII (Intentional Infliction of Emotional Distress); and Count XV (Privacy by Publication of Private Facts).  There is

no dispute that each of these tort claims is covered by Indiana's Tort Claim Act ("ITCA"), which provides, in relevant part, that a tort claim brought "against a political subdivision is barred unless notice is filed with: (1) the governing body of that political subdivision; and (2) … the Indiana political subdivision risk management commission … within one hundred eighty (180) days after the loss occurs." IND. CODE § 34-13-3-8.  Notice "must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice." IND. CODE § 34-13-3-10.

After receiving notice of the claim, the government entity must approve or deny the claim within ninety days. IND. CODE § 34-13-3-11.  "A person may not initiate a suit against a governmental entity unless the person's claim has been denied in whole or in part." IND. CODE § 34-13-3-13.  Thus, the filing of a claim against a political subdivision is a "two-step process—the filing of a claim, and, if denied, the filing of a lawsuit." *Brown v. Alexander*, 876 N.E.2d 376, 383 n.4 (Ind. Ct. App. 2007).

To "avoid denying plaintiffs an opportunity to bring a claim where the purpose the statute has been satisfied," *id.* at 381, "[n]ot all technical violations of the statute are fatal to a claim …." *Escobedo v. City of Ft. Wayne*, No. 1:05-CV-424-TS, 2008 WL 1971405, at *43 (N.D. Ind. May 5, 2008).  Strict non-compliance may be excused and "[s]ubstantial compliance with the statutory notice requirements is sufficient when the purpose of the notice requirement is satisfied." *Chariton v. City of Hammond*, 146 N.E.3d 927, 934 (Ind. Ct. App. 2020) (quotation marks and citation omitted).  "The

purposes of the notice statute include informing the officials of the political subdivision with reasonable certainty of the accident and surrounding circumstances so that [the] political [sub]division may investigate, determine its possible liability, and prepare a defense to the claim." *Town of Cicero v. Sethi*, 189 N.E.3d 194, 210 (Ind. Ct. App. 2022) (quotation marks and citation omitted).

As we have previously determined, Plaintiffs here failed to file a formal notice of tort claim or otherwise to substantially comply with the ITCA notice requirements prior to filing their original complaint in this matter.[11]  On December 30, 2021, nine days after filing their complaint, Plaintiffs for the first time sent a document titled Notice of Tort Claim to Defendants Noblesville School District, Noblesville High School, Superintendent Niedermeyer, and Principal McCaffrey via U.S. Mail.  Defendants received this document on January 10, 2022, and Plaintiffs filed their amended complaint one day later, on January 11, 2022.

As Defendants highlight, there are several procedural and substantive deficiencies in Plaintiffs' December 30, 2021 letter titled "Notice of Tort Claim" (the "Notice Letter"), including that it was neither delivered in person nor sent by certified mail as required by Indiana Code § 34-13-3-12; that it was sent only to Defendants' counsel and NHS's

---

[11] In making this determination, the Court considered Plaintiffs' November 12, 2021 demand letter, a January 5, 2022 letter from the Indiana Political Subdivision Committee acknowledging receipt of Plaintiffs' December 30, 2021 Notice of Tort Claim; and several email communications between Plaintiffs' and Defendants' counsel that are attached as Exhibit B to Plaintiffs' Additional Evidence Disclosure [Dkt. 169].  Having held as a matter of law that none of these documents either strictly or substantially complied with the ITCA's notice requirements, we do not address them further in this order.

superintendent and principal rather than the school board, which is the governing body of the school; that it did not identify the extent of Plaintiffs' losses or the amount of damages sought; that it did not identify E.D.'s residence at the time of the loss or at the time of filing the notice; and that it did not include allegations related to Plaintiffs' invasion of privacy claims.

Apart from these deficiencies in the notice itself, Defendants cite Plaintiffs' failure to wait until they had received a denial of their claims or ninety days had passed with no response from Defendants before filing suit in violation of Indiana Code § 34-13-3-13. Defendants point out that, by statute, the earliest date Plaintiffs were permitted to initiate their state law claims against Defendants absent a denial was April 10, 2022—ninety days after receipt of the Notice Letter.  Instead, Plaintiffs filed their amended complaint on January 11, 2022, one day after Defendants received the Notice Letter.

Based on the procedural and substantive deficiencies detailed above, we cannot find that Plaintiffs strictly complied with the ITCA notice requirements prior to filing their amended complaint against Defendants.  Accordingly, we address whether the notice Plaintiffs provided nonetheless substantially complied with the ITCA's notice requirements.  In assessing substantial compliance, "[t]he crucial consideration is whether the notice supplied by the claimant of his intent to take legal action contains sufficient information for the city to ascertain *the full nature of the claim* against it so that it can determine its liability and prepare a defense." *Town of Cicero*, 189 N.E.3d at 210 (quoting *Schoettmer v. Wright*, 992 N.E.2d 702, 707 (Ind. 2013)) (emphasis in *Town of Cicero*).  "[M]ere actual knowledge of an occurrence, even when coupled with routine

investigation, does not constitute substantial compliance." *Id.* Here, although the filing of the  Notice represents an attempt on Plaintiffs' part to comply with the ITCA's notice requirement provisions, that document falls well short of providing Defendants sufficient information from which they could ascertain the full nature of the claims against them, lacking as it did any information that identified any names of the individuals involved, explaining how or to what extent Plaintiffs were damaged by Defendants' alleged conduct, or specifying the amount of damages Plaintiffs were seeking.

The Notice Letter contained no mention at all of Plaintiffs' invasion of privacy tort claims.  With regard to Plaintiffs' claims for bullying, intimidation, and defamation, the Notice Letter stated only that these claims were based on "[m]ultiple Noblesville teachers [having] posted rude comments about E.D. on social media," and "administration members of Noblesville High School [having] pulled E.D. out of class and harassed her following the revocation of her student group's status," but included no information regarding how Plaintiffs were injured by such conduct or the extent of those injuries. Dkt. 169-4.  The Notice Letter provided slightly more information related to Plaintiffs' intentional infliction of emotional distress claim, stating that Defendants were liable "for administrators' actions of calling her out of class, refusing to meet with her at another time, declining E.D.'s request to have another adult present, and requesting to go through her phone," which interaction the Notice Letter stated "left the student distressed, nearly in tears, and physically shaking." *Id.*  The Notice Letter included no specific damages amount, stating merely that "E.D. demands monetary compensation for the violations of laws outlined in this Notice." *Id.*  At some later point in the litigation, Plaintiffs provided

Defendants information regarding the amount and types of damages E.D. alleges she incurred, including a claim for lost scholarship and employment opportunities, but the Notice itself provided no indication that Plaintiffs were alleging any such damages, much less disclose even a ballpark range of the amount of compensation Plaintiffs were seeking for these losses.

Plaintiffs argue that, even if the Notice Letter was in some way deficient, Defendants were fully informed of the extent of Plaintiffs' claimed losses prior to receiving the Notice Letter from the parties' preparations for depositions to respond to Plaintiffs' motion for preliminary injunction as well as in communications between counsel that occurred the first week of January 2024, a few days prior to the filing of the amended complaint. The only reference in those communications to Plaintiffs' tort claims, however, is the following statement by Plaintiffs' counsel: "[T]here are serious problems with FERPA/ARPA, harassment, bullying, actual malice defamation, etc., that we simply cannot ignore. … The vilification of a 15-year-old 5' tall freshman young woman by the senior leadership of your client is breathtaking. … We'd expect very serious disciplinary action against the teachers, among other things." Dkt. 169-3 at 2. That statement contains no information regarding the extent of Plaintiffs' injury from the alleged "vilification" or the scope of their claimed damages.

Insofar as Plaintiffs contend that Defendants were on notice of the nature of the tort claims based on its preparations in order to respond to Plaintiffs' motion seeking preliminary injunctive relief, Plaintiffs' request for injunctive relief was limited to their federal claims alleging violations of their constitutional rights, which involved facts,

50

individuals, and claims for relief wholly separate from Plaintiffs' state law tort claims. Additionally, the referenced email exchanges largely contain standard communications related to planning depositions and attendance at a settlement conference. None of the emails included any of the six elements of notice required under the ITCA, nor did they satisfy the form or substance requirements of the ITCA.

Even assuming that the content of the Notice Letter was sufficient to substantially comply with the ITCA, the provision of adequate notice is not the only procedural prerequisite to suit under the ITCA. As detailed above, the statute requires that the government entity must be given time to respond to the claim. Here, Plaintiffs failed to comply with this second step of the ITCA notice process by filing their amended complaint only one day after Defendants' receipt of the Notice Letter, without having either waited the statutory ninety-day period or received a formal denial of their claims, whichever came first. It is well-established that the ITCA "prohibits a claimant from filing his suit before the claims procedure has been complied with." *Bradley v. Eagle-Union Cmty. Sch. Corp. Bd. of Sch. Trustees*, 647 N.E.2d 672, 676 (Ind. Ct. App. 1995).

Plaintiffs' contention that defense counsel's November 23, 2021 response to their November 12, 2021 demand letter constitutes a denial of the state law tort claims set forth in the Notice Letter is a nonstarter. Initially, Plaintiffs fail to explain how Defendants' actions a month and a half prior to receipt of the Notice Letter qualifies as a denial of the claims set forth in the Notice Letter. In any event, as we previously detailed in holding that Plaintiffs' demand letter did not comply with the ITCA's notice provisions, the demand letter addressed only Plaintiffs' federal constitutional claims and did not provide

*any* allegations regarding their state law tort claims.  Accordingly, Defendants' counsel's response to that demand letter by declining to reinstate Plaintiffs' student club—one of the remedies requested by Plaintiffs in connection with their federal claims—cannot constitute a denial of Plaintiffs' tort claims of bullying, intimidation, defamation, intentional infliction of emotional distress, and invasion of privacy, which claims, as described above, involve facts, individuals, and forms of relief wholly separate from those related to the decision to revoke NSFL's club status.

Insofar as Plaintiffs argue that Defendants' engagement in settlement negotiations surrounding the motion for preliminary injunction that Plaintiffs had filed contemporaneously with their original complaint constituted a denial of their tort law claims, we are not persuaded by this argument.  As detailed above, Plaintiffs' request for a preliminary injunction, like their November 12, 2021 demand letter, dealt only with the federal claims raised in this litigation.  Accordingly, Defendants' engagement in preparations to respond to the motion for preliminary injunction could not reasonably have been understood by Plaintiffs as a denial of their state law tort claims.

For these reasons, we hold that Plaintiffs failed to either strictly or substantially comply with the ITCA's notice requirements and prematurely filed suit before receiving a denial of their claims or ninety days had passed after Defendants' receipt of the Notice Letter.  In cases where a claimant prematurely files suit but submits an adequate notice of tort claim within 180 days of the date of loss, courts have determined that dismissal without prejudice is the appropriate remedy.  *See Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 869–70 (Ind. Ct. App. 1999) (citing *Bradley*, 647 N.E.2d at 676).  Here, however,

the Notice Letter provided by Plaintiffs was *not* adequate and more than 180 days have now passed since the events upon which Plaintiffs base their state law tort claims occurred.  Thus, any tort claims notice served at this point would be untimely and futile.

It is, of course, true that, "[s]o long as [the ITCA's] essential purpose has been satisfied, it should not function as a trap for the unwary." *Schoettmer*, 992 N.E.2d at 706 (quotation marks and citation omitted).  But the legislature's purpose in enacting the ITCA has not been fulfilled here and Plaintiffs cannot be described as unwary.  They knew of the existence and requirements of the ITCA at least by the time they sent the Notice Letter, yet still failed to satisfy the form, timing, and content requirements of the statute.  When Plaintiffs' failure to comply with the ITCA notice requirements was first raised by Defendants in their motion to dismiss, the 180-day period had not yet run during which time period Plaintiffs could have remedied the deficiencies brought to their attention by Defendants' filing.  Yet, Plaintiffs undertook no efforts to ensure their compliance with the ITCA at that time.  In response to Defendants' motion to dismiss, Plaintiffs did not argue that the Notice Letter remedied the problem, nor did they even inform the Court of its existence.  Instead, they compounded the problem when they again failed to make a cogent argument that the Notice Letter satisfied the ITCA notice requirements in their request for reconsideration of our initial dismissal of their state law tort claims for failure to comply with the ITCA.  Under these circumstances, Defendants are entitled to summary judgment on Plaintiffs' state law tort claims for failure to comply with the ITCA's notice requirements.

**IV.    Conclusion**

For the reasons detailed above, Plaintiffs' Motion for Summary Judgment [Dkt.

152] is <u>DENIED</u> and Defendant's Motion for Summary Judgment [Dkt. 157] is

<u>GRANTED</u>.  All other currently pending motions are hereby <u>DENIED AS MOOT</u>.  Final

judgment shall be entered accordingly.

IT IS SO ORDERED.


Date: _____3/15/2024_____          _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Laura Kathleen Buckner
Charitable Allies
kbuckner@charitableallies.org

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Zachary S. Kester
Charitable Allies, Inc.
zkester@charitableallies.org

Spencer Eastman Rehn
Charitable Allies
srehn@charitableallies.org

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com